Alan McSURELY, et al.

v.

John L. McCLELLAN, et al.

Thomas Ratliff, individually and as sometime Commonwealth Attorney for Pike County, Kentucky, Appellant.

No. 82–2369.

United States Court of Appeals,
District of Columbia Circuit.

Submitted Nov. 18, 1982.

Decided Dec. 10, 1982.

Benjamin L. Zelenko, B. Michael Rauh, and Martin Shulman, Washington, D.C., were on the brief for appellant.

Morton Stavis, Hoboken, N.J., Randolph Scott-McLaughlin, Broadway, N.Y. and Charles N. Mason, Jr., Washington, D.C., were on the brief for appellees.

Before WALD and SCALIA, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM:

In August 1967, Kentucky officials, executing warrants issued under a state sedition statute, arrested the McSurelys (appellees) and seized books, papers, and other personal possessions from their home. Shortly thereafter, a federal court declared the state statute unconstitutional, enjoined prosecution, and ordered the appellant Thomas B. Ratliff (Commonwealth Attorney for Pike County, Kentucky) to hold the seized material in safekeeping pending final disposition of the case. *McSurely v. McClellan*, 282 F.Supp. 848 (E.D.Ky.1967), *app. dismissed*, 390 U.S. 412, 88 S.Ct. 1112, 19 L.Ed.2d 1272 (1968). The state prosecutor subsequently made these papers available to a Senate subcommittee investigating riots which occurred in Nashville, Tennessee earlier that year. In 1969, the McSurelys sued Senator John L. McClellan (Chairman of the Senate subcommittee), several subcommittee staffers, and appellant, claiming that the defendants had unlawfully seized and disseminated personal papers from their home and seeking compensatory and punitive damages for loss of employment, invasion of privacy, and embarrassment resulting from these actions.

Shortly before trial, Ratliff moved for dismissal or, in the alternative, for summary judgment based on claims of absolute and qualified prosecutorial immunity. The district court denied this motion and an oral request for stay pending appeal. Ratliff appealed and moved this court for stay pending appeal. We denied his request for stay, but expedited consideration of the appeal. We now affirm the district court's order. Ratliff's investigation and arrest of the McSurelys and his subsequent actions as custodian of the McSurelys' papers are not advocative functions and thus are not protected by absolute immunity from suit. Moreover, Ratliff is not entitled to summary judgment on qualified immunity because material facts are placed in dispute by the McSurelys' proffer of evidence that Ratliff should have known that his actions were illegal.

## I. FACTUAL BACKGROUND

This court's earlier opinions in *United States v. McSurely,* 473 F.2d 1178, 1180–84 (D.C.Cir.1972), and *McSurely v. McClellan,* 426 F.2d 664, 666–67 (D.C.Cir.1970) describe in detail much of the factual background of this lawsuit. Because this case arises on pretrial motion, we construe the facts which remain in dispute in the light most favorable to the McSurelys. In brief, Alan and Margaret McSurely were field organizers for the Southern Conference Educational Fund, Inc. Alan McSurely was also connected with the National Conference of New Politics and Vietnam Summer. According to the McSurelys, their duties included investigating the socio-political milieu of Pike County, informing the people of their legal rights, and helping local citizens to organize to overcome their problems.

On August 11, 1967, Ratliff and approximately twenty other persons, including local businessmen, the McSurelys' landlord, and a local judge, met at the Pikeville courthouse to discuss the McSurelys' activities and to plan the McSurelys' arrest for sedition and a search of their home.[1] At the meeting, Ratliff stated that a Pike

1. Plaintiffs' Consolidated Pretrial Memorandum, Embodying Changes Made Following Submission of Original pt. I, ¶¶ 8–13, pt. II, ¶ 1(a)–(b), *reprinted in* McSurely Brief app. at 2a–3a, 11a.

County jury would "undoubtedly" convict the McSurelys and that, although the conviction would "probably" be overturned on appeal, "his purposes would be accomplished by the initial conviction."[2] He prepared an affidavit for the McSurelys' landlord to sign and then presented the signed affidavit to the local judge, who prepared an arrest warrant for Alan McSurely and a search warrant for the McSurelys' home.[3] The arrest warrant charged McSurely with sedition against the state in violation of Ky.Rev.Stat. § 432.040.[4] The search warrant authorized in general terms the seizure of "seditious matter or printing press or other machinery to print or circulate seditious matter." In an earlier proceeding, we found that the affidavit, in part because it was based on hearsay, did not "support a finding of probable cause," *United States v. McSurely*, 473 F.2d 1178, 1187 (D.C.Cir. 1972). We further described the search warrant as "the very antithesis of the 'particularity' required by the Fourth Amendment." *Id.* at 1189.

On the evening of August 11, pursuant to the warrant, Pike County officials, directed by Ratliff, arrested Alan McSurely and searched the McSurelys' home. The search appears to have gone far beyond the warrant's scope. *See id.* at 1187–88. During the search, which lasted several hours, Ratliff discovered that Margaret McSurely had once been employed by the Student Non-Violent Coordinating Committee. He thereupon obtained a warrant for her arrest as well.[5]

On September 14, 1967, in response to a complaint filed by the McSurelys, a three-judge district court in Kentucky (one judge dissenting on procedural grounds) held the sedition statute unconstitutional on its face and enjoined state prosecution of the McSurelys. *McSurely v. Ratliff,* 282 F.Supp. 848 (E.D.Ky.1967), *app. dismissed,* 390 U.S. 412, 88 S.Ct. 1112, 19 L.Ed.2d 1272 (1968).[6] The court also directed Ratliff to hold "in safekeeping" the materials taken from the McSurelys' home, pending a possible appeal of the court's decision.[7] No appeal was ever filed.

Shortly thereafter, Laverne Duffy, Assistant Counsel to the Permanent Subcommittee on Investigations (Subcommittee) of the Senate Committee on Government Operations, contacted Ratliff by telephone to inquire about the seized items. Pursuant to this telephone call, a Subcommittee investigator, John Brick, visited Ratliff in Pikeville. Ratliff, concerned that the safekeeping order might prohibit his allowing Brick to examine the McSurely materials, telephoned Judge Moynahan, the dissenting

---

**2.** *Id.* pt. I, ¶ 13, McSurely Brief app. at 3a.

**3.** *Id.* pt. I, ¶¶ 9–10, McSurely Brief app. at 2a.

**4.** Ky.Rev.Stat. § 432.040 states that:

Any person who by word or writing advocates, suggests or teaches the duty, necessity, propriety or expediency of criminal syndicalism or sedition, or who prints, publishes, edits, issues or knowingly circulates, sells, distributes, publicly displays or has in his possession for the purpose of publication or circulation any written or printed matter in any form advocating, suggesting or teaching criminal syndicalism or sedition, or who organizes or helps to organize, or becomes a member of or voluntarily assembles with any society or assemblage of persons that teaches, advocates or suggests the doctrine of criminal syndicalism or sedition shall be confined in the penitentiary for not more than twenty-one years, or fined not more than ten thousand dollars, or both.

**5.** Plaintiff's Consolidated Pretrial Memorandum, *supra* note 1, ¶ 19, McSurely Brief app. at 4a.

**6.** The court observed:

It is difficult to believe that capable lawyers could seriously contend that this statute is constitutional. . . . In addition, the conclusion is inescapable that the criminal prosecutions were instituted, at least in part, in order to stop [the McSurelys'] organizing activities in Pike County.

282 F.Supp. at 852.

**7.** The court's order required in relevant part:

that all books, papers, documents and other material now in the custody of the Commonwealth Attorney for Pike County, Ratliff, reflected by the Inventory filed in this action continue to be held by him in safekeeping until final disposition of this case by appeal or otherwise.

*See United States v. McSurely,* 473 F.2d 1178, 1191 (D.C.Cir.1972).

judge on the three-judge panel that had issued the order, for advice. The judge was noncommittal. As Judge Moynahan later explained in his deposition:

> I didn't think it behooved me to give him legal advice but he persisted and I said, well, I'm not going to tell you to get into any confrontation with the Senate Committee.[8]

Ratliff made no further inquiry into his duties under the safekeeping order.

Brick confirmed with Ratliff that the McSurely material contained information relating to the activities of a number of organizations in which the Subcommittee was interested. Ratliff permitted Brick to examine and make notes on the seized materials and provided him with copies of 234 of the documents, which Brick took back with him to Washington. 473 F.2d at 1191. A number of Margaret McSurely's personal possessions were among the copied materials, including the names and addresses of friends and a love letter from a prominent Washington columnist. Subsequently, on October 16, 1967, at the direction of Senator McClellan, Chairman of the Subcommittee, Brick subpoenaed certain of the McSurely materials in Ratliff's possession.

When the McSurelys received the subpoenas, they asked the three-judge court for an order prohibiting Ratliff from releasing the subpoenaed materials to the Subcommittee and directing him to return the seized materials. Substantial litigation followed, culminating in a Sixth Circuit ruling that the documents must be returned to the McSurelys, but without prejudice to the Subcommittee's right to enforce the subpoenas. *McSurely v. Ratliff,* 398 F.2d 817 (6th Cir. 1968).

Upon receipt of these materials, the McSurelys were immediately served with new subpoenas. They appeared before the Subcommittee on March 4, 1969, but refused to produce the subpoenaed materials. Pursuant to a Senate resolution, they were indicted for contempt of Congress on August 29, 1969, tried in the district court for the District of Columbia, and convicted on June 20, 1970. On appeal, we reversed the conviction, ruling that the subpoenas were invalid because the Subcommittee, in framing them, had relied on information which was the fruit of an unconstitutional search. *United States v. McSurely,* 473 F.2d at 1194.

The McSurelys filed this damages action in the district court on March 4, 1969 (the same day they appeared before the Subcommittee) alleging violations of their rights under 42 U.S.C. §§ 1981, 1983, and 1985, and under the first, fourth, fifth, and fourteenth amendments of the Constitution, and seeking $100,000 compensatory and $100,000 punitive damages from each defendant for loss of employment, invasion of privacy, and humiliation and embarrassment resulting from the various actions of the defendants. The district court stayed all proceedings pending final resolution of the criminal case against the McSurelys. On December 26, 1970, we vacated that stay as overbroad, and remanded for further proceedings. *McSurely v. McClellan,* 426 F.2d 664 (D.C. Cir.1970). Shortly thereafter, the federal defendants moved to dismiss or, alternatively, for summary judgment, claiming legislative immunity. The district court denied the motion, rejected a request for reconsideration or certification under 28 U.S.C. § 1292(b) of the issue of legislative immunity, but stayed discovery by the McSurelys.

On appeal, we assumed jurisdiction to review the district court's interlocutory order under 28 U.S.C. § 1291; we affirmed in part and reversed in part. *McSurely v. McClellan,* 553 F.2d 1277 (D.C.Cir.1976) (en banc), *cert. dismissed,* 438 U.S. 189, 98 S.Ct. 3116, 57 L.Ed.2d 704 (1978). We rejected the claim that the federal defendants' conduct was completely insulated from judicial scrutiny by the Speech and Debate Clause, but found that several of the McSurelys' allegations implicated legislative activity protected by the Clause. We remanded for further proceedings on the remaining is-

---

**8.** Deposition of Bernard Moynahan, Chief Judge for the Eastern District of Kentucky, *quoted in McSurely v. McClellan,* No. 516–69, mem. op. at 4 (D.D.C. Nov. 9, 1982).

sues, which included alleged dissemination of some or all of the 234 documents to individuals or agencies outside of the Subcommittee and an alleged conspiracy between federal officials and Ratliff to inspect, obtain copies of, and transport back to Washington portions of the seized materials " 'notwithstanding the [safekeeping] order of the United States District Court,' " and without the McSurelys' knowledge. *Id.* at 1288 (citation omitted).[9] We examined at length Ratliff's role in the alleged conspiracy and concluded that although only a trial would permit a conclusive determination of Ratliff's authority under the safekeeping order, it was a "fair certainty that plaintiffs have made out a prima facie case to the effect that the purpose of the 'safekeeping' order of the three-judge court was to preserve the seized items both for the McSurelys' benefit and for the orderly administration of the judicial process . . . and that Brick's investigative activity . . . violated [the] order." *Id.* at 1291. However, because Ratliff was not a party to this appeal, we had "no occasion to decide whether a state prosecutor enjoys absolute immunity . . . for [investigative] actions." *Id.* at 1288 n. 38.

On remand, the district court lifted its stay of pretrial discovery. On September 29, 1982, after the close of discovery but prior to trial, Ratliff moved to dismiss or, in the alternative, for summary judgment on grounds of absolute and qualified prosecutorial immunity. On November 16, 1982, the district court denied Ratliff's motion and rejected an oral request for stay of the trial as to him pending appeal.[10] That same day, Ratliff filed the instant appeal with this court and moved for a stay pending appeal and expedited consideration of the appeal. Jury selection for the long-awaited trial commenced the next day. We subsequently denied Ratliff's motion for stay, but expedited the appeal.

## II. PROCEDURAL ISSUES

### A. *Jurisdiction*

■ Before discussing the substance of the district court's order, we must determine whether we have jurisdiction to review that order. Ordinarily, a denial of a motion to dismiss or for summary judgment is not a "final decision" within the meaning of 28 U.S.C. § 1291, and therefore is not reviewable. *McSurely v. McClellan,* 521 F.2d 1024, 1031 (D.C.Cir.1975), *aff'd in pertinent part en banc,* 553 F.2d 1277 (1976), *cert. dismissed,* 438 U.S. 189, 98 S.Ct. 3116, 57 L.Ed.2d 704 (1978); *see generally* 10 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2715 (1976). This rule prevents piecemeal litigation and eliminates delays occasioned by interlocutory appeals.

■ However, the rationale for granting absolute immunity is "as much to protect the relevant persons from a trial on their actions as it is to protect them from the outcome of the trial," *Briggs v. Goodwin,* 569 F.2d 10, 59 (D.C.Cir.1977) (Wilkey, J. writing separately), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978). We therefore have held that orders denying absolute immunity to government defend-

---

9. Judge Leventhal, writing for the court, held that the federal defendants were entitled to summary judgment on the allegations pertaining to the legality of the Subcommittee staff's inspection of the documents brought by Brick to Washington, the use of information obtained by Brick as the basis for congressional subpoenas, and the issuance of contempt of Congress citations against the McSurelys. The court remanded to the district court for initial determination several questions, including whether Brick's inspection of the materials in Ratliff's possession and transportation of 234 documents to Washington violated the McSurelys' fourth amendment rights and whether Brick selected and transported to Washington copies of documents which he knew to be wholly unrelated to the Subcommittee's business. *McSurely v. McClellan,* 553 F.2d 1277, 1298–99 (D.C.Cir.1976) (en banc), *cert. dismissed,* 438 U.S. 189, 98 S.Ct. 3116, 57 L.Ed.2d 704 (1978).

10. The district court's response to Ratliff's motion came in two unpublished orders, one issued on November 9, 1982, and the other on November 16. In the November 9 order, the district court rejected Ratliff's arguments based on Judge Moynahan's deposition testimony. The court disposed of Ratliff's remaining arguments in the November 16 order. The appeal addresses both orders.

ants are immediately appealable under the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). *See, e.g., Dellums v. Powell,* 660 F.2d 802, 804 (D.C. Cir.1981); *Briggs v. Goodwin,* 569 F.2d at 58–60 (Wilkey, J., writing separately), *McSurely v. McClellan,* 521 F.2d at 1030–31. *Accord Nixon v. Fitzgerald,* —— U.S. ——, ——, 102 S.Ct. 2690, 2698, 73 L.Ed.2d 349 (1982).[11] These interlocutory orders are appealable under 28 U.S.C. § 1291 because they " 'conclusively determine the disputed question, resolve an important issue completely separate from the merits of [the] action, and [are] effectively unreviewable on appeal from a final judgment.' " *Nixon,* —— U.S. at ——, 102 S.Ct. at 2698 (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978)); *see Cohen, supra,* at 546–47, 69 S.Ct. at 1225–26.

The harder question is whether a denial of qualified immunity is also immediately reviewable. Before *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the companion case to *Nixon,* a distinction might have been drawn between the appealability of claims of absolute and qualified immunity. Pre-*Harlow* qualified or "good faith" immunity had both objective and subjective aspects. The objective element, as defined in *Wood v. Strickland,* 420 U.S. 308, 320, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975), involved a presumptive knowledge of and respect for "basic, unquestioned constitutional rights." The subjective element referred to "permissible intentions." *Id.* The significance of factfinding for the subjective aspect of qualified immunity analysis limited the utility of summary judgment in disposing of claims against public officials. *See, e.g., Imbler v. Pachtman,* 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 989 n. 13, 47 L.Ed.2d 128 (1975) ("The fate of an official with qualified immunity

depends upon the circumstances and motivations of his actions, as established by the evidence at trial."); *Forsyth v. Kleindienst,* 599 F.2d 1203, 1209 (3d Cir.1979), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981). As the Court recognized in *Harlow:*

> The subjective element of the good faith defense frequently has proved incompatible with our admonition in *Butz* [*v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)] that insubstantial claims should not proceed to trial. Rule 56 of the Federal Rules of Civil Procedure provides that disputed questions of fact ordinarily may not be decided on motions for summary judgment. And an official's subjective good faith has been considered to be a question of fact that some courts have regarded as inherently requiring resolution by a jury.

—— U.S. at —— – ——, 102 S.Ct. at 2737–38.

■ *Harlow,* however, jettisoned the subjective, fact-oriented element of qualified immunity and recast the doctrine in terms of objective good faith. In doing so, the Court stressed that part of the purpose of immunity, whether absolute or qualified, is to shield government officials from "the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Id.* at ——, 102 S.Ct. at 2738. The Court therefore consciously sought to facilitate summary disposition of insubstantial claims against governmental officials. Consequently, we believe that appellate review of a denial of a motion for summary disposition must be available to ensure that government officials are fully protected against unnecessary trials under qualified immunity on the same basis as for absolute immunity.[12]

---

11. Our cases have dealt only with summary judgment. We see no reason, however, to distinguish for purposes of review between summary judgment and dismissal under Fed.R. Civ.P. 12(b). Both raise the question whether, as a matter of law, a public official is immune from suit.

12. Alternatively, litigants may utilize 28 U.S.C. § 1292(b)'s certification procedure. Section 1292(b) permits a district court to certify an order for appellate review if the court is:

> of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opin-

## B. *Stay of Trial*

We now address a second preliminary matter. In addition to expedited consideration of his appeal, petitioner requested that this court stay further proceedings against him pending appeal. We denied his request, but proceeded expeditiously to decide this appeal.

■ The requirements for a stay are well-established. In deciding whether to order equitable relief, a court must consider (1) whether the petitioner is likely to prevail on the merits of his appeal, (2) whether, without a stay, the petitioner will be irreparably injured, (3) whether issuance of a stay will substantially harm other parties interested in the proceeding, and (4) wherein lies the public interest. *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958). Each of these requirements may, of course, be applied flexibly according to the unique circumstances of each case. Thus, for example, where the latter three factors strongly favor interim relief, this court has required only that the petitioner demonstrate a "substantial case on the merits," even if ultimate success is not a mathematical probability. *Washington Metropolitan Area Transit Comm'n v. Holi-*day *Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir. 1977).

■ In most cases, a petitioner appealing a district court order denying summary judgment on immunity grounds should be able to satisfy the last three elements of the *Virginia Petroleum Jobbers* standard. A showing of irreparable injury will generally be automatic from invocation of the immunity doctrine if the trial has begun or will commence during the pendency of the petitioner's appeal.[13] Concomitantly, the public interest in an official's "unflinching discharge of [his] duties"[14] normally will support a stay. Finally, injury to others caused by a delay of trial normally will be subsidiary to the overarching interest in preserving the immunity defense.

■ The last two elements in the present case, however, do not support a stay. The interests of the public and of the McSurelys in avoiding further delay are substantial, considering that the case has been pending since 1969, and that the motion was not filed until shortly before trial, with no explanation for its lateness.[15] Since these factors favor proceeding with the trial, Ratliff's burden of demonstrating a substantial case on the merits is heavy.

ion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.... [We] may thereupon, in [our] discretion, permit an appeal to be taken from such order .... *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or [this court] shall so order.

28 U.S.C. § 1292(b) (emphasis in original); *see Katz v. Carte Blanche Corp.*, 496 F.2d 747, 753–56 (3d Cir.) (en banc), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974). We think this procedure is particularly appropriate when claims of immunity are at issue.

13. Litigation costs, standing alone, do not rise to the level of irreparable injury. As we observed in *Virginia Petroleum Jobbers* "[m]ere injury, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to satisfy the requirement of irreparable injury. 259 F.2d at 925. However, compelling a public official to proceed to trial before the merits of an immunity defense are determined will generally constitute irreparable injury not because of the expense of litigation, but because of the irretrievable loss of immunity from suit. *Briggs v. Goodwin,* 569 F.2d 10, 59 (D.C.Cir.1977) (Wilkey, J., writing separately), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978).

14. *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950); *see Nixon v. Fitzgerald,* —— U.S. ——, ——, 102 S.Ct. 2690, 2699, 73 L.Ed.2d 349 (1982); *Briggs v. Goodwin,* 569 F.2d 10, 59 (D.C.Cir.1977) (Wilkey, J., writing separately), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978).

15. We also note that the motion for summary judgment which we review here is based in substantial part on the recent deposition of Judge Moynahan. The district court permitted Ratliff to take that deposition more than a month after the close of discovery, and so long after the case began, only "upon Ratliff's assurances that taking the deposition would not delay the start of trial." *McSurely v. McClellan,* No. 516–69, mem. op. at 2 n. 1 (Nov. 9, 1982).

■ When we first considered Ratliff's immunity claims in our order denying his motion for stay,[16] they appeared to lack the requisite substantiality to satisfy the *Holiday Tours* flexible standard. With respect to Ratliff's absolute immunity claim, we found that the McSurelys had alleged investigative and administrative actions which do not fall within the recognized ambit of a prosecutor's absolute immunity from suit. Similarly, on the papers before us, we found genuine and material factual disputes that precluded summary judgment on qualified immunity grounds. Our examination of the merits below, while leading us to conclude that Ratliff's claim to qualified immunity is stronger than we at first blush believed, ultimately confirms this preliminary assessment.[17]

### III. IMMUNITY CLAIMS

Ratliff relies on both absolute and qualified immunity for actions taken as prosecuting Commonwealth Attorney for Pike County, Kentucky. He contends that because his activities were quasi-judicial—and therefore subject to absolute immunity— the McSurelys' claims against him should have been dismissed for failure to state a cause of action. In the alternative, Ratliff argues that he is entitled to qualified immunity because he acted in "good faith," thus meriting summary judgment. We reject these arguments.

### A. *Absolute Immunity*

■ Governmental officials receive either absolute or qualified immunity from suits for damages "to shield them from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald,* —— U.S. ——, ——, 102 S.Ct. 2727, 2732, 73 L.Ed. 396 (1982). Most official acts receive only qualified immunity, an immunity which varies "in proportion to the nature of [an] official['s] functions and the range of decisions that conceivably might be taken in 'good faith.' " *Nixon v. Fitzgerald,* —— U.S. ——, ——, 102 S.Ct. 2690, 2700, 73 L.Ed.2d 349 (1982). Absolute immunity is accorded only to "the especially sensitive duties of certain officials." *Id.* Thus, for example, judges possess absolute immunity for all judicial acts, *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), and prosecutors possess absolute immunity with respect to the initiation and pursuit of prosecution, *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

■ This functional analysis confines absolute prosecutorial immunity to "quasi-judicial" actions. As this court has repeatedly held, a prosecutor engaged in essentially investigative or administrative functions receives only the lesser protection of qualified immunity. *Dellums v. Powell,* 660 F.2d 802, 805 (D.C.Cir.1981); *Halperin v. Kissinger,* 606 F.2d 1192, 1208 (D.C.Cir. 1979); *aff'd in part, cert. dismissed in part,* 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981); *Briggs v. Goodwin,* 569 F.2d 10, 21 (D.C.Cir.1977), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978); *Apton v.*

---

**16.** A copy of this order is in the appendix.

**17.** Our disposition illustrates the differing tests that are applied for, on the one hand, assuming jurisdiction under the collateral order doctrine and, on the other hand, granting injunctive relief under *Virginia Petroleum Jobbers.* Under the collateral order doctrine, we consider "whether a petitioner's right to appellate review of the immunity claim—whether or not ultimately successful—will be effectively lost if we decline jurisdiction." *McSurely v. McClellan,* 521 F.2d 1024, 1032 (D.C.Cir.1975), *aff'd in pertinent part en banc,* 553 F.2d 1277 (1976), *cert. dismissed,* 438 U.S. 189, 98 S.Ct. 3116, 57 L.Ed.2d 704 (1978). Under the *Virginia Petroleum Jobbers* standard, we also must consider

harm to other parties and to the public interest, and the petitioner's likelihood of success on the merits. As this case demonstrates, a petitioner's claims may qualify under the collateral order doctrine but not meet the standards for a stay. We recognize the practical difficulties our assumption of jurisdiction and denial of stay may create for the district court—for example, the problem of what instructions to give the jury on the issues that are pending on appeal. Expeditious disposition of the appeal, we think, will minimize these difficulties. For the future, we expect that most motions for summary judgment on immunity grounds will—and should—be made well before trial, so that a stay is not essential.

*Wilson,* 506 F.2d 83, 91 (D.C.Cir.1974); *see also Harlow v. Fitzgerald,* —— U.S. at —— n. 16, 102 S.Ct. at 2735 n. 16 (sanctioning this approach).

It may sometimes be hard to distinguish between those aspects of a prosecutor's responsibility which are quasi-judicial and those which cast the prosecutor in the role of an investigative or administrative officer. In the instant case, however, Ratliff's activities clearly are not quasi-judicial.

*Imbler v. Pachtman,* 424 U.S. at 421–24, 96 S.Ct. at 990–92, defined insulation of the prosecutor's role in the judicial process as a primary justification for absolute immunity. In line with this rationale, a prosecutor receives absolute immunity only when he acts as an "advocate," that is, in his role as a participant in the judicial phase of the criminal process. When a prosecutor acts in any other capacity, the rationale for absolute immunity dissolves and the prosecutor receives only the lesser, qualified immunity accorded to administrative or investigative officials. *See Robichaud v. Ronan,* 351 F.2d 533, 536–37 (9th Cir.1965). The crucial question, then, is how closely associated a prosecutor's challenged activities are with the judicial process.

▪ Again, *Imbler* provides guidance in addressing this question. "[A]bsolute immunity under *Imbler* extends only so far as necessary to protect a prosecutor's decision with respect to the initiation and conduct of particular cases." *Briggs v. Goodwin,* 569 F.2d at 19–20. Although not establishing a mechanical immunity test, *Imbler* narrowly restricts the range of activities for which absolute immunity is available. Advocacy, as *Imbler* recognized, may take a prosecutor beyond the confines of the courtroom:

A prosecuting attorney is required, constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particu-

lar defendants, which witnesses to call, and what other evidence to present. Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluation of evidence.

*Imbler v. Pachtman,* 424 U.S. at 431 n. 33, 96 S.Ct. at 995 n. 33. Advocacy, however, encompasses only those activities that are "intimately associated with the judicial phase of the criminal process," *id.* at 430, 96 S.Ct. at 995; it therefore excludes activities that are not closely connected to the initiation or conduct of a particular case. To immunize absolutely a prosecutor's actions unrelated or only tangentially related to the prosecution of a particular case would contravene the functional rationale which underpins the absolute immunity doctrine.

▪ The McSurelys' principal allegations regarding defendant Ratliff's actions as Commonwealth Attorney do not significantly implicate Ratliff's protected advocative function. The McSurelys allege that Ratliff:

a) Participated in a public meeting, known by him at the time to be unconstitutional, for the purpose of preventing plaintiffs from disseminating ideas.

b) Prepared an arrest warrant and a search warrant, both flagrantly unconstitutional.

c) Participated in the raid on the McSurely home and took materials which went far beyond the warrant.

d) Conspired with representatives of the McClellan Subcommittee to transfer to them documents which had been illegally seized and which were irrelevant to the Subcommittee's business.

e) Conspired with representatives of the McClellan Subcommittee to transfer documents to them, some of which were required by court order to be returned and the remainder of which were required to be retained in safekeeping.

▪ The first activity—participating in a public meeting—is wholly unconnected to advocacy involving a particular case.[18]

18. The McSurelys allege that Ratliff partici- pated in a quasi-public meeting at the court-

Similarly, preparation of the arrest and search warrants and participation in the search and seizure are nonadvocative. They involve not the protected decision to initiate prosecution, but rather the earlier, preliminary gathering of evidence which may blossom into a potential prosecution. The latter is investigatory activity and therefore receives only qualified immunity. *United States v. Heldt,* 668 F.2d 1238, 1276 (D.C.Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982); *Apton v. Wilson,* 506 F.2d 83, 91 (D.C.Cir. 1974); *Robichaud v. Ronan,* 351 F.2d 533, 536–37 (9th Cir.1965); *accord Marrero v. City of Hialeah,* 625 F.2d 499, 505 (5th Cir.1980) ("a prosecutor who assists, directs or otherwise participates ... in obtaining evidence prior to an indictment undoubtedly is functioning more in his investigative capacity than in his quasi-judicial capacities of 'deciding which suits to bring and ... conducting them in court'") (quoting *Imbler,* 424 U.S. at 424, 96 S.Ct. at 992), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981).

The McSurelys' allegations regarding the safekeeping of the seized materials also describe activities outside the scope of a prosecutor's absolute immunity from suit. Ratliff's responsibilities as custodian of the seized McSurely materials involve administrative and not advocative action. Subsequent to the safekeeping order, Ratliff could not have been prosecuting a particular case against the McSurelys, because the district court had invalidated the Kentucky sedition statute and enjoined further prosecution. This decision clearly terminated any prosecutorial authority Ratliff might otherwise have possessed.

### B. *Qualified Immunity*

Ratliff's investigative and administrative activities are entitled to qualified immunity from suit. As we noted earlier, *Harlow* makes the test for qualified immunity an objective one. It "holds" that the test is whether the conduct of a governmental official performing discretionary functions "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." —— U.S. at ——, 102 S.Ct. at 2738. The Court explained:

> If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.... If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.[19]

*Id.*

Relying largely on *Harlow,* appellant Ratliff unsuccessfully moved the district court for summary judgment. The court found that summary judgment was inappropriate because the McSurelys had offered to produce substantial evidence to

house in Pikeville on August 11, 1967, called to discuss complaints about the activities of anti-poverty workers in the area. During the meeting Ratliff prepared an affidavit for James Compton, the McSurelys' landlord, to execute. Ratliff then presented the executed affidavit to a local judge present at the meeting, who prepared arrest and search warrants. The affidavit, which was based on hearsay information, alleged that Alan McSurely possessed seditious materials and a printing press and contained a detailed description of the McSurelys' home. *United States v. McSurely, supra* note 7, at

1184–87. Even viewed in the light most favorable to Ratliff, this meeting represents no more than the initiation of an investigation. There is no allegation that prior to the meeting Ratliff possessed any evidence of criminal conduct by Alan McSurely or had any intention to bring charges against him.

19. We are aware that some elements of this formulation seem inconsistent with the Court's "holding" that the test is an objective one. Given our disposition of the present motion, we need not resolve that perplexity here.

establish that Ratliff should have known that his actions were illegal, and thus put material facts in dispute even under *Harlow's* objective inquiry. We agree.

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Abraham v. Graphic Arts International Union,* 660 F.2d 811, 814 (D.C.Cir.1981); *Weiss v. Kay Jewelry Stores, Inc.,* 470 F.2d 1259, 1261 (D.C.Cir. 1972). When considering a motion for summary judgment, a trial court's function is to ascertain whether disputed facts exist, not to try them. *Abraham,* 660 F.2d at 814. Furthermore, in determining whether a claim is ripe for summary disposition, courts resolve any doubts against the movant. They accord the opposing party all favorable inferences that may be drawn from the proffered evidence and take as true all adequately supported facts presented by the opposing party. *Id.; Bouchard v. Washington,* 514 F.2d 824, 827 (D.C.Cir.1975). On appeal, we determine only whether the district court abused its discretion in denying a motion for summary judgment. Like the district court we read the record in the light most advantageous to the party resisting summary judgment. *Poller v. CBS,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Abraham,* 660 F.2d at 814–15; *see Harlow,* —— U.S. at ——, 102 S.Ct. at 2737 n. 26.

■ Applying these principles to the instant case,[20] we find no abuse of discretion in the district court's denial of summary judgment to Ratliff.

#### 1. *Investigative Activities*

a. *Constitutional Violations in the Meeting, the Warrants, and the Search*

■ Insofar as Ratliff's participation in the public meeting raises issues separate from those presented by the warrants there devised, the possibility that Ratliff was aware he was acting illegally can hardly be gainsaid, since the complaint alleges that Ratliff conspired with others to obtain a conviction that he knew would "probably" be overturned on appeal. The McSurelys' allegations concerning Ratliff's application for arrest and search warrants and participation in the search were scrutinized at length in our earlier cases. We found that the warrants were constitutionally invalid.[21] Under *Harlow's* objective test, the only remaining question is whether Ratliff had reason to know this at the time. We conclude that there is a genuine issue of fact whether he did.

Qualified immunity for the warrants, and the search under them, turns upon how evident were (1) the invalidity of the affidavit upon which the warrants were based; (2) the impermissible generality of the search warrant; and (3) the search's exceeding of the warrant's scope. The affidavit, executed by James Compton, stated that Compton was a "reputable citizen" of Pike County, and that he had reasonable grounds to believe "that seditious printed matter and printing press or other machinery to print and circulate seditious matter is being kept on the premises of Alan McSurely." *See United States v. McSurely,* 473 F.2d at 1185. The grounds for his belief

---

**20.** *Harlow* does not purport to change the operation of Rule 56 in immunity cases. The *Harlow* Court discarded the subjective aspect of the good faith defense to avoid routine conflict with the rigors of Rule 56. This significantly reduces the potential for factual disputes; however, such disputes may arise even under the objective test. Whether an official should have known that his actions violated the law—the example postulated in *Harlow*—can be judged without recourse to the trier of fact when the question essentially is one of law. However, when there is a genuine issue of fact—for example, what a reasonable person in like circumstances should have known—Rule 56 compels a trial.

**21.** In *United States v. McSurely,* 473 F.2d at 1185–86, we held that the search warrant was based on an inadequate affidavit. The affidavit was equally defective as a basis for the warrant for Alan McSurely's arrest. The record before us does not indicate the details of the warrant for Margaret McSurely's arrest. Thus, Ratliff has failed to establish a claim for summary judgment on the validity of her arrest.

were that "he was informed by James Madison Compton, a reputable citizen of Pike County, Kentucky, that on said August 4, 1967, at approximately 12:00 noon, that [sic] the said James Madison Compton did observe certain seditious materials, being pamphlets, films, pictures and articles or equipment used in the teaching of sedition and printing and circulating seditious matter at or on the above described premises . . . ." *Id.* Ratliff presented the executed affidavit to Judge Pauley, also a participant in the public meeting, who prepared an arrest warrant for Alan McSurely and a search warrant for the McSurely home.

In our view, there is a genuine issue of material fact whether by 1967, when Ratliff prepared and presented the Compton affidavit, its inadequacy under the fourth amendment should have been clear to a public prosecutor. The Supreme Court had long before established that mere affirmance of belief or suspicion would not satisfy the fourth amendment's requirement of probable cause drawn from facts and circumstances presented under oath or affirmation. *Nathanson v. United States,* 290 U.S. 41, 47, 54 S.Ct. 11, 13, 78 L.Ed. 159 (1933). By 1964, the Court also had held that an affidavit based on hearsay information was insufficient unless the affidavit (1) explained the underlying circumstances showing that the suspect was engaged in illegal activity and (2) demonstrated that the informant was "credible" and his information "reliable." *Aguilar v. Texas,* 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964).

As we observed in *United States v. McSurely,* 473 F.2d at 1186, the Compton affidavit contained "precisely the type of conclusional statement which the *Aguilar* Court found inadequate." The *Aguilar* affidavit stated that:

Affiants have received reliable information from a credible person and do believe that heroin . . . and other narcotics . . . are being kept at the above described premises for the purpose of sale and use contrary to the provisions of the law.

378 U.S. at 109, 84 S.Ct. at 1511. This affidavit failed because the affiant did not allege personal knowledge of the matters to which he attested and did not identify his informant or set forth facts sufficient to enable a magistrate to judge independently the informant's credibility or the reliability of his information. Similarly, the Compton affidavit identified both the affiant and the informant merely as "reputable citizen[s] of Pike County," and did not provide any of the underlying circumstances necessary to test the informant's credibility and reliability. *See United States v. McSurely,* 473 F.2d at 1186–87. Ratliff, as an attorney and public prosecutor, arguably had reason to know that the affidavit he prepared and presented to support a warrant contravened *Aguilar's* injunction against unsupported hearsay affidavits.

We also noted in *United States v. McSurely* that the warrant issued by Ratliff and its execution were "remarkably comparable" to the warrant and search repudiated two years earlier in *Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). The McSurely warrant directed the "searchers" to seize "seditious matter or printing press or other machinery to print or circulate seditious matter." Pursuant to this warrant, state officials conducted a broadranging search of the McSurelys' home. The purported 'seditious materials' seized, voluminous enough to fill one-third of a jail cell, included the personal clothing of Mrs. McSurely, boxes of office supplies, cancelled checks, unused checkbooks, college examination and review notes, the McSurelys' personal love letters, and their marriage certificate. One box contained 104 copies of Handbill Literature, *all* of which was published by the Commonwealth of Kentucky. There were 564 loose books impounded, which included 'Tricks and Training for Cats,' several books of poetry, one of which was 'Poetry and Prose' by William Cullen Bryant, and the 'Washington Yellow Page Telephone Directory.' In essence, the McSurely home was ransacked and appellants were cleaned out of all their papers and books. No 'printing press or other machinery to

print or circulate seditious matter' is listed on the inventory of things seized. *United States v. McSurely,* 473 F.2d at 1187–88 (emphasis in original).

In *Stanford,* decided in 1965, a local magistrate issued a warrant pursuant to a Texas sedition statute similar to the Kentucky statute, which authorized the issuance of a warrant "for the purposes of searching for and seizing any books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings, or any written instruments showing that a person or organization is violating or has violated any provision of this Act." The warrant specifically described the premises to be searched, stated affiant's belief that the premises contained materials within the warrant's scope, and ordered the executing officer to enter the premises immediately to conduct a search for these items. The executing officers spent four hours collecting approximately half the books in the house. Most of the books seized were stock from the suspect's business; some were from his personal library. The books and pamphlets taken included almost 300 separate titles, ranging from the works of Karl Marx to those of Pope John XXIII and Justice Hugo Black. The officers also seized private documents and papers, including the suspect's marriage certificate, his insurance policies, household bills and receipts, and files of his personal correspondence.

The Supreme Court emphasized that "this warrant was of a kind which it was the purpose of the Fourth Amendment to forbid—a general warrant." The Court stated that the fourth amendment's mandate that a warrant particularly describe the things to be seized "is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas which they contain." *Id.* at 485, 85 S.Ct. at 511 (citation omitted). *Stanford*

controlled our inquiry in *United States v. McSurely,* leading us to conclude that the search and seizure was a "flagrant abuse" of the McSurelys' fourth amendment rights. A reasonable prosecutor arguably had reason to know that the warrant was too general to satisfy the standard delineated two years earlier in *Stanford.* This conclusion is buttressed by allegations in the amended complaint that Ratliff in fact knew and indeed publicly acknowledged that the warrant was probably invalid.[22]

Finally, it is obvious to us in retrospect that the items seized went far beyond the already overbroad scope of the warrant. Therefore, it is surely at least arguable that Ratliff should have known at the time that his search exceeded the scope of the warrant.

b. *Presumptions of Regularity*

▮ Ratliff asserts that he had the right to presume that the state sedition statute, Ky.Rev.Stat. § 432.040, was valid. *Cf. Michigan v. DeFillipo,* 443 U.S. 31, 38, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979) ("The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws."). We need not pass on this argument, however, for it cannot shield Ratliff from the McSurelys' allegations that the arrest and search warrants violated the fourth amendment and that the search went beyond the scope of the warrant. Those allegations do not depend on whether the underlying statute was valid.

▮ Ratliff also might have raised, but did not, a second presumption of regularity that would shield his activities under the arrest and search warrants. The fourth

---

**22.** According to an FBI memorandum describing the August 11 planning meeting:

Mr. Ratliff stated that undoubtedly a Pike County, Kentucky, jury would convict Mr. McSurely of sedition. He stated that he expected the American Civil Liberties Union (ACLU) would probably be able to override

convictions with appeals to superior courts but that his purposes would be accomplished by the initial conviction.

Federal Bureau of Investigation Report dated August 14, 1967, *reprinted in* McSurely Brief app. at 49a–50a.

amendment's command that an independent judge or magistrate approve a warrant is an important safeguard against unreasonable searches and seizures. Conversely, however, the judge's independent opinion that there is probable cause for an arrest or a search creates a presumption of regularity, absent fraud in obtaining the warrant or a conspiracy between prosecutor and judge. *See Commonwealth v. Sincavage,* 439 F.2d 1133, 1134 (3d Cir.1971) (per curiam) (police officer procured warrant in good faith; irrelevant whether probable cause actually existed); *Guerro v. Mulhearn,* 498 F.2d 1249, 1256 (1st Cir.1974) (summary judgment inappropriate where police officers may have obtained warrant through perjured testimony); *cf. Rodriguez v. Richey,* 556 F.2d 1185, 1193 (5th Cir.1977) (police officer shielded by warrant from common law action for false arrest), *cert. denied,* 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 799 (1978). *See generally United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965) (in marginal case, search with warrant may be upheld where search without warrant would not be). This presumption, if unrebutted, would shield Ratliff from liability for obtaining and executing the arrest and search warrants. It would not, however, shield him from the charge that the search went beyond the scope of the search warrant. *See Duncan v. Barnes,* 592 F.2d 1336, 1338 (5th Cir.1979).

We think it premature to explore in the abstract what quantum of proof would suffice to overcome this presumption. In this case, the invalidity *in fact* of the search and arrest warrants is sufficiently clear that there is a genuine issue whether the McSurelys will be able to show that a reasonable prosecutor would have known that they were invalid. *See Baskin v. Parker,* 602 F.2d 1205, 1208 (5th Cir.1979) (sheriff may be liable for obtaining and executing an invalid search warrant).

*2. Safekeeping Activities*

 We consider next Ratliff's conduct under the district court's "safekeeping" order. The following facts have been established. *United States v. McSurely,* 473 F.2d at 1190–91. On August 12, 1967, the day after the raid on the McSurelys' home, Ratliff announced publicly that he would provide congressional committees with access to the materials seized from the McSurelys' home. Four days later, the McSurelys brought suit in federal court seeking a declaratory judgment that the Kentucky sedition statute was unconstitutional, an injunction against prosecution, and the return of the seized materials. On September 11, the court ordered Ratliff to "return to the plaintiffs such personal articles and property as he does not deem material to the investigation and prosecution," to retain custody of all other evidence, and to produce an inventory list of the seized materials. None of their property was returned to the McSurelys at this time.[23]

On September 14, the three-judge federal court declared the Kentucky statute unconstitutional on its face and enjoined further proceedings against the McSurelys under the statute. The court also ordered

> that all books, papers, documents and other materials now in the custody of the Commonwealth Attorney of Pike County, Ratliff, reflected by the Inventory filed in this action continue to be held by him in safekeeping until final disposition of this case by appeal or otherwise.

After the order was issued, Laverne Duffy, Assistant Counsel for the Subcommittee, telephoned Ratliff to inquire whether he had possession of the seized materials. Thereafter, John Brick, a Subcommittee investigator, contacted Ratliff and arranged to examine the materials. These contacts occurred during the pendency of the safekeeping order; all were made prior to the expiration of time for appeal from the district court ruling. Ratliff subsequently gave Brick access to the materials in his

---

23. Plaintiffs Consolidated Pretrial Memorandum, *supra* note 1, ¶¶ 23–24, McSurely Brief app. at 5a.

custody. As we noted in *United States v. McSurely*, 473 F.2d at 1191:

> A locked door was opened for the investigator. He entered and inspected the documents, made notes therefrom and received xeroxed copies of some of them from one of Mr. Ratliff's subordinates.

Brick transported copies of over two hundred documents to Washington including several personal letters belonging to Mrs. McSurely.

On these facts, the McSurelys allege that Ratliff disseminated documents to the federal defendants which he knew were irrelevant to their official business and conspired with these officials to transfer to them documents illegally seized and which Ratliff had no legal right to transfer. Ratliff responds first, that the safekeeping order did not prevent him from allowing Brick to inspect and photocopy the papers, and second, that his actions were approved by one of the district court judges who signed the order. Ratliff asserts that before making the materials available to Brick, he telephoned Judge Moynahan—the dissenting member of the three-judge federal panel—who advised him to cooperate with the Subcommittee investigators.

We agree with the district court that Ratliff is not entitled to summary judgment on these allegations. The language of the safekeeping order, considered under the circumstances in which it was drawn, does not provide a sufficient basis for Ratliff's assertion of authority to disseminate the seized materials. The requirement of "safekeeping" is readily susceptible of the interpretation that it prohibited Ratliff's actions and that since the court had enjoined prosecution, the McSurelys were entitled to the return of their property, with the possibility of appeal providing the only justification for retaining the papers. Ratliff's own doubts, evidenced in his call to Judge Moynahan, reinforce our unwillingness to foreclose the McSurelys from an opportunity to prove that a reasonable person would have known that he could not allow the Subcommittee investigator to study and copy the papers.

Ratliff's alternative argument—that Judge Moynahan sanctioned dissemination of the materials—is also insufficient to justify summary judgment. Ratliff argues that Judge Moynahan's statement to him in a telephone conversation that "I'm not going to tell you to get into a confrontation with the Senate Committee" authorized his actions. We, however, agree with the district court that the retrospective testimony of a dissenting judge, given fifteen years after the order was issued, is not dispositive of the order's meaning, that an *ex parte* telephone call cannot relieve a court-appointed officer of the duties imposed upon him, and that in any event, Judge Moynahan's testimony does not conclusively show—if it shows at all—that he authorized Ratliff to release the McSurelys' papers.

CONCLUSION

For the foregoing reasons, we affirm the district court's refusal to dismiss the McSurelys' complaint against Ratliff and its denial of summary judgment to him. We find, as a matter of law, that Ratliff's activities were not entitled to absolute immunity from suit. We also find that the district court's denial of summary judgment on qualified immunity claims is supported by the disputed evidence in the record.[24]

APPENDIX

ORDER DENYING MOTION FOR STAY AND GRANTING EXPEDITED CONSIDERATION OF THE APPEAL

Order issued November 18, 1982.

Before TAMM, WALD, and SCALIA, Circuit Judges.

Order PER CURIAM.

---

24. Our holding, of course, does not preclude the district court from ruling at some future date, based on additional evidence, that Ratliff has sustained his claim to qualified immunity from suit.

PER CURIAM:

On consideration of petitioner's emergency motion for stay of his trial pending appeal and expedited consideration of the appeal, it is

ORDERED by the Court that, appearing that appellate jurisdiction is proper, consideration of the above-docketed appeal is expedited. Jurisdiction is proper in this Court under 28 U.S.C. § 1291. Petitioner unsuccessfully moved the district court for dismissal and, in the alternative, summary judgment on grounds of prosecutorial immunity. Although as a rule interlocutory orders are not immediately appealable, 28 U.S.C. § 1291, a well-recognized exception is made for appeal from denial of a motion to dismiss or for summary judgment when the basis for the motion is a claim of immunity, *see Nixon v. Fitzgerald,* —— U.S. ——, ——, 102 S.Ct. 2690, 2698, 73 L.Ed.2d 349 (1982); *Dellums v. Powell,* 660 F.2d 802, 804 (D.C.Cir.1981).

Having taken jurisdiction, this Court will decide the merits of petitioner's appeal on an expedited basis. To preserve petitioner's interest in avoiding unnecessary litigation, the expedited appeal will be decided on the parties' papers and without oral argument. It is

FURTHER ORDERED that any submissions to the Court be filed by the close of business on Friday, November 19, 1982. It is

FURTHER ORDERED by the Court that petitioner's motion for stay of his trial pending appeal is denied. On the two grounds—absolute prosecutorial immunity and qualified prosecutorial immunity—relied on in support of his motion, petitioner has not presented a persuasive claim for relief. His case on neither ground is sufficiently meritorious to warrant the equitable remedy sought.

With respect to petitioner's claim of absolute immunity, the complaint before the district court alleged petitioner's responsibility for actions investigative and administrative in character. These activities, whose characterization appears to be un-

challenged in petitioner's moving papers, do not fall within the recognized ambit of a prosecutor's absolute immunity from prosecution. *See Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 994–95, 47 L.Ed.2d 128 (1976); *Harlow v. Fitzgerald,* —— U.S. ——, —— n. 16, 102 S.Ct. 2727, 2735 n. 16, 73 L.Ed.2d 396 (1982). Nor does the assertion of qualified immunity presented in petitioner's moving papers appear to support summary judgment. Genuine and material factual disputes appear unresolved. Fed.R. Civ.P. 56. The district court order notes, *inter alia,* plaintiff's allegations challenging the search conducted by petitioner as beyond the scope of his warrant authority.

Circuit Judge TAMM did not participate in this order.