541 A.2d 170

BOARD OF TRUSTEES OF the STATE UNIVERSITIES
AND COLLEGES, et al.

v.

James V. FINERAN.

No. 1425, Sept. Term, 1987.

Court of Special Appeals of Maryland.

May 13, 1988.

Michael A. Anselmi, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellants.

Virginia W. Barnhart (K. Donald Proctor and Miles & Stockbridge, on the brief), Towson, for appellee.

Argued before WILNER, BLOOM and KARWACKI, JJ.

WILNER, Judge.

James V. Fineran was appointed as Director of Public Relations for Salisbury State College, effective July 30, 1984. Although his initial salary ($30,000) was fixed on an annual basis, the letter from the college president confirming his appointment mentioned no specific term of employment. In mid-July, 1985, Fineran was informed by the

president, Thomas E. Bellavance, that his salary for the ensuing fiscal year would be increased to $31,600.

On September 5, 1985, Dr. Bellavance rebuked Mr. Fineran for some statements he had made to a reporter for the Salisbury *Daily Times* concerning the student housing shortage at the college and a proposed new school of business management. Dr. Bellavance made clear that he intended to terminate Mr. Fineran's employment but offered Fineran the opportunity to resign. Mr. Fineran gave some thought to the matter and, in the belief that he had no fixed term of employment and that Dr. Bellavance indeed had the authority to fire him, he submitted his resignation on September 9. In accordance with Dr. Bellavance's offer, the resignation was to take effect December 31, 1985; Mr. Fineran would continue to draw his salary until then but would immediately leave the college and perform no further duties for it.

After submitting his letter of resignation, Mr. Fineran consulted counsel. On October 4, 1985, his attorney wrote to Dr. Bellavance, asserting that the resignation was submitted under duress, that Dr. Bellavance had misrepresented his authority to discharge Mr. Fineran, and that Dr. Bellavance's actions had denied Mr. Fineran various statutory and Constitutional rights. Counsel demanded a hearing "to deal with these claims and their proper resolution, including the reinstatement of Mr. Fineran to his position (should he be so willing)" and asked that the Board of Trustees of the State Colleges and Universities "place any comprehensive liability insurance carrier provided for under Section 14–109 [Md.Code Ann.Educ. art.] on notice of the claims set forth in this letter...." A copy of this letter was sent to James K. Archibald, chairman of the Board of Trustees.

An Assistant Attorney General, W. Carter Lester, Jr., responded for the college on October 15. The essence of the response was that (1) Dr. Bellavance sought Mr. Fineran's resignation not because of any untrue statements made to the media but because of a general dissatisfaction with

Fineran's handling of public relations for the college, (2) Dr. Bellavance never asserted the authority to discharge Mr. Fineran but had made clear that dismissal authority lay with the Board of Trustees, (3) the resignation was the product of negotiation and was voluntary, (4) the Board was due to consider and act on the resignation at its next meeting on November 21, and (5) Fineran could withdraw the resignation before then, but that, if he did so, Dr. Bellavance would recommend and ask the Board to approve Fineran's termination. Mr. Lester denied that Dr. Bellavance or the college had violated any of Mr. Fineran's rights and contended that Fineran had no statutory or Constitutional right to a hearing.

Mr. Fineran elected not to withdraw his resignation, and, at its November meeting, the Board approved it. In March, 1986, Fineran filed this action in the Circuit Court for Anne Arundel County against the Board of Trustees, each of its individual members, the college, and Dr. Bellavance. Contemporaneously, he filed a claim under the State Tort Claims Act (Md.Code Ann.State Gov't art., §§ 12–101—12–110) with the State Treasurer who, a month later, denied the claim on the ground that there was no insurance coverage for it.

Fineran eventually filed an amended complaint to which, after some discovery, all defendants responded with a motion to dismiss or, in the alternative, for summary judgment. Although the motion raised the general defense that the complaint failed to state a claim upon which relief can be granted, the thrust of it, as made clear in argument, was that each of the defendants enjoyed an absolute or qualified sovereign or governmental immunity with respect to the various claims made by Mr. Fineran. After a hearing, the court denied the motion, and this appeal followed.

### Claims And Issues

There are three classes of defendants here—(1) the Board and the College, which are units of the State Government, (2) the individual members of the Board, and (3) Dr. Bella-

vance, who would be classed with the individual Board members but for the fact that he is sued separately in one count (Count XIII) of the amended complaint. The theories of liability pled against these defendants and the defenses raised by them are similar in some respects, different in others.

As we shall see, in the 13 counts pled in his amended complaint Mr. Fineran has alleged the violation of many, many rights. They all seem to hinge, however, on two basic assertions: (1) that he was entitled to the protections of Md.Code Ann.Educ. art., § 14–110, which were denied him, and (2) that he was discharged in retribution for the exercise of his right of free speech. For these violations, he claims, the defendants have no immunity, either because none exists or because the State, by law, has waived it.

To set the stage for a discussion of what is before us, we must examine briefly some provisions in title 14 of the Education article, in particular § 14–110.

Salisbury State College is one of six institutions of higher education that, during the period relevant here, were under the direction and control of the Board of Trustees of State Colleges and Universities. § 14–101. As part of its governing authority, the Board was empowered to "make all appointments to positions at each institution from nominations submitted by the president of the institution," to "fix the salary and tenure of each faculty member," and to "dismiss any faculty member as provided in § 14–110...." § 14–105. Section 14–106, setting forth the duties and powers of the college presidents, authorizes them to "[n]ominate for appointment by the Board of Trustees, and ... recommend for dismissal by the Board, any faculty member or administrator not in the merit system."

Section 14–110, the statute most at issue here, provides that, on the written recommendation of the president, the Board may remove "any faculty member or professional assistant" for any of six enumerated reasons—immorality, dishonesty, official misconduct, insubordination, incom-

petence, or willful neglect of duty. It requires, however, that, before removal, the Board must send the person a written copy of the charges against him and give him an opportunity for a hearing.

Mr. Fineran asserts that, as a professional assistant and administrator, his position had a fixed term of 12 months, but that, whether or not he had such a term, he was subject to § 14–110 and could be terminated only (1) by the Board, (2) for one of the enumerated causes, and (3) after notice and an opportunity for a hearing. He urges that his "resignation" was the product of duress and misrepresentation and amounts in fact to a constructive discharge. He claims that he was discharged for making truthful, though perhaps unpopular, statements about important matters of public concern, that there was no legitimate cause for this discharge, and that it was accomplished in defiance of his rights under § 14–110. On this basis, he complains:

(1) In Count I, that the Board and the college breached an express contract to continue his employment either (i) through June 30, 1986, or (ii) indefinitely;

(2) In Count II, that the Board and the college intentionally and wrongfully discharged him contrary to clearly stated public policy in § 14–110, the First and Fourteenth Amendments to the U.S. Constitution, and Md. Decl. of Rights, art. 24;

(3) In Count III, that Dr. Bellavance and the Board members acted outside the scope of their official duties in willful or reckless disregard of his rights and wrongfully discharged him with reason to know that they were acting contrary to the clearly stated public policy set forth in the cited statute and Constitutional provisions;

(4) In Counts IV, VI, IX, and XI, that the Board and the college violated his common law right of free speech under the First Amendment and Md. Decl. of Rights, art. 24, that they deprived him of his liberty interest in freedom of speech and his property interest in continued employment without due process of law, and that they violated his right

of free speech and various rights, privileges, and immunities under the Fourteenth Amendment, all in contravention of 42 U.S.C. § 1983;

(5) In Counts V, VII, VIII, and X, that Dr. Bellavance and the Board members also violated all of those rights, privileges, and immunities;

(6) In Count XII, that all defendants violated his statutory rights under § 14–110; and

(7) In Count XIII, that Dr. Bellavance, without justification, induced the other defendants to breach Fineran's employment contract.

In each count, Mr. Fineran sought compensatory money damages of $1,000,000. Additional punitive damages were sought in Counts III through XIII.

The defendants' claim of immunity is grounded in the first instance on their status as units of the State government or as State officials exercising public and discretionary duties. More particularly, they assert:

(1) As to Count I (breach of contract), the State has retained its sovereign immunity as to contract claims unless they are based on a written contract executed on behalf of the State by an employee acting within the scope of his authority and that Fineran's claim does not arise from such a contract.

(2) Any waiver of immunity as to Counts II and III (wrongful discharge) must be based on the State Tort Claims Act (Md.Code Ann.State Gov't art., §§ 12–104 and 12–105) and that there is no waiver under those sections for tortious acts not within the scope of the public duties of the employee. Count III specifically charges that Dr. Bellavance and the Board members acted outside the scope of their official duties; hence, no waiver.

(3) As to the claims against the college and the Board based on the asserted violation of Fineran's various Constitutional rights (Counts IV, VI, IX, and XI), those defendants, as units of the State government, enjoy a sovereign

immunity that has not been waived by the Tort Claims Act. The principal issue here is whether the waiver of immunity under that Act encompasses claims based on Constitutional violations or is limited to immunity for traditional common law torts.

(4) As to the Constitutionally based claims against the individual defendants, they enjoy a qualified governmental immunity by reason of their discretionary duties that remains intact upon Fineran's failure to establish that they (i) acted with malice or (ii) violated any of his "clearly established" rights.

The Circuit Court did not address any of these issues with particularity. It simply held that Fineran had stated a claim upon which relief could be granted and that the defendants had "not established that they are immune from suit." The only specific finding made by the court was that "[i]n addition, as Defendant's [sic] policy guidelines indicate that administrative positions are twelve month appointments, they have thus failed to establish that Plaintiff was an at will employee not entitled to a hearing."

*Appellate Jurisdiction—Scope of Review*

Ordinarily, an immediate appeal does not lie from the denial of a motion to dismiss or for summary judgment. Where the effect of that denial is a rejection of the defendant's claim of immunity from suit, however, such an appeal does apparently lie under the collateral order doctrine. *State v. Hogg,* 311 Md. 446, 535 A.2d 923 (1988), and cases cited therein. Mr. Fineran acknowledges the defendants' right to bring this appeal.[1]

---

1. We would be less than candid if we did not express our concern about the breadth of this aspect of *Hogg* and the practical difficulties that are involved in allowing immediate appeals whenever the defense of sovereign or governmental immunity is rejected through the denial of a motion to dismiss or for summary judgment under Md. Rule 2–322. In *Hogg,* and in most (though not all) of the cases allowing these essentially interlocutory appeals, the issues relating to the immunity defense can be resolved without becoming too entangled in

The scope of review at this stage is not so easily delineated. Normally, of course, when an appeal is allowed under the collateral order doctrine, review is limited to the issue(s) that justify the appeal in the first instance—those that would be effectively unreviewable following entry of final

---

the facts and merits of the underlying claim. Indeed, it is that very separation that brings the case under the collateral order doctrine. That is not the situation here, however. As we shall see, one cannot resolve the immunity questions in this case without effectively deciding the merits as well. This is particularly a problem when the relevant facts, as pled or as shown, are in dispute, for we then have to view the facts in a very partial light and draw inferences and conclusions that the trier of fact ultimately may reject. Unfortunately, *Hogg* articulates no distinctions between entangled and unentangled cases, or between cases where the trial court has ruled directly on the pleadings and where it has considered evidence outside the pleadings and has thus treated the motion as one for summary judgment.

After argument in this case, the Court of Appeals decided *Bunting v. State*, 312 Md. 472, 540 A.2d 805 (1988). *Bunting* involved an appeal from an order denying a motion to dismiss an indictment; the motion was based on the alleged violation by the State of the "single transfer" rule of art. III(d) of the Interstate Agreement on Detainers.

In a per curiam opinion, the Court held that an immediate appeal would not lie under the collateral order doctrine from such an order. In its discussion of that doctrine, the Court held that "the idea that an issue is not effectively reviewable after the termination of the trial because it involves a 'right' to avoid the trial itself, should be limited to double jeopardy claims *and a few other extraordinary situations.*" (Emphasis added, at 481–82, 540 A.2d at 809.) Otherwise, the Court continued, "there would be a proliferation of appeals under the collateral order doctrine," which "would be flatly inconsistent with the long-established and sound policy against piecemeal appeals." *Id.*

In a footnote to that last statement, the Court stated that *Hogg* "should not be viewed as reflecting a contrary policy" and that "[w]hile the opinion in that case may contain some broad language relating to assertions of immunity from the trial itself, such language must be read in the context of what was before the Court."

What was before the Court in *Hogg*, of course, was the immediate appealability of an order rejecting the defense of sovereign or governmental immunity, which the *Hogg* Court obviously regarded as an "extraordinary situation." As is evident from Judge Eldridge's concurring opinion in *Bunting, Hogg* was not overruled but merely limited in some undefined way.

The Court of Appeals may choose to give some greater clarification on the matter, perhaps using this case as the vehicle to do so. Given the actual holding in *Hogg*, however, even without regard to its broad language, we do not read *Bunting* as allowing us to dismiss this appeal.

.

judgment. Under that principle, and indeed under the order for appeal filed by the defendants, the only issues now before us are those relating to the defendants' claims of immunity. Unfortunately, however, these claims of immunity cannot be entirely separated from the underlying issues in the case. Immunity as to Count I (breach of contract), as we shall see, depends on whether Fineran had a written contract embodying the terms he claims were breached. Immunity with respect to the Constitutionally based claims depends in large measure on just what rights Mr. Fineran had, how "clearly established" they were, and what the various defendants did in contravention of them.

There is no way that we can view the immunity claims in a vacuum, as Fineran demands. Nor, assuming our jurisdiction in the first instance, are we obliged to do so. Where the immunity issues are so bound up with the underlying claims, appellate courts have proceeded to consider those underlying claims even if, in doing so, the immunity issues themselves become moot. See, for example, *Martinez v. California*, 444 U.S. 277, 283–85, 100 S.Ct. 553, 558–59, 62 L.Ed.2d 481, *reh. denied* 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980); *Carlson v. Conklin*, 813 F.2d 769 (6th Cir.1987); *McSurely v. McClellan*, 697 F.2d 309 (D.C.Cir. 1982), *cert. denied* 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985); and *cf. Public Service Comm'n v. Patuxent Valley*, 300 Md. 200, 218, 477 A.2d 759 (1984).

## Breach Of Contract (Count I)

■ As a matter of common law, no action may be brought against the State or any of its agencies unless (1) specific legislative authority has been given for the action and (2) either funds are available for satisfaction of a resulting judgment or the entity sued has the power to raise those funds. *University of Maryland v. Maas*, 173 Md. 554, 197 A. 123 (1938); *Chas. E. Brohawn & Bros. v.*

*Board,* 269 Md. 164, 304 A.2d 819 (1973); *Calvert Associates v. Department,* 277 Md. 372, 357 A.2d 839 (1976). By Md.Code Ann.State Gov't art., § 12–201, the General Assembly has provided for a limited waiver of that immunity in breach of contract actions. Section 12–201(a) provides:

> "Except as otherwise expressly provided by law of the State, the State, its officers, and its units may not raise the defense of sovereign immunity in a contract action, in a court of the State, based on a written contract that an official or employee executed for the State or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee."

That is the statute relied upon by Fineran in pressing Count I. He claims to have had a written contract for a 12–month employment signed by Dr. Bellavance on behalf of the Board. The State urges that no such contract has been shown. As Fineran's claim is based solely on the assertion of a specific written contract—no oral agreement is alleged—resolution of the immunity issue will necessarily resolve the merits of the claim itself, for, if the evidence, taken in the light most favorable to Mr. Fineran, fails to establish the contract he alleges, he had no contract and was therefore an "at will" employee.

In this regard, two things are clear, and really undisputed. No written contract setting forth the terms and conditions of his employment was ever offered to or signed by Mr. Fineran; nor, at any time prior to the tendering of his resignation, did he believe that he had any kind of contract at all. Throughout his deposition testimony, Mr. Fineran repeatedly acknowledged that, while he and various officials of the college, including Dr. Bellavance, had discussed the duties of the job and some of the penumbral perquisites and working conditions, neither a fixed term nor a particular grievance procedure had ever been discussed or offered. He expressed his view of the tenure question most succinctly:

> "In keeping with my previous testimony, I knew nothing about any recourse other than the fact that the atmo-

sphere at the college was that the President could fire who [sic] he chose, when he chose.... It was my understanding that the administrators felt that the President of the college could fire them for whatever reason he deemed appropriate."

In urging now a contrary view, that his appointment carried a 12–month term that was renewed for a like term, Fineran relies on three documents: (1) a provision in the Administrative Salary Plan adopted by the Board that "[a]ll administrative positions are twelve month appointments unless otherwise indicated," (2) the letter of July 31, 1984, from Dr. Bellavance confirming his initial appointment, which mentions an "annual salary," and (3) the memorandum of July 10, 1985, from Dr. Bellavance informing him of his salary increase "From 1984/85 $30,000 to 1985/86 $31,-600." We fail to see how any of those documents, individually or together, constitutes a written contract carrying a fixed 12–month term.

In *Staggs v. Blue Cross of Maryland*, 61 Md.App. 381, 388, 486 A.2d 798, *cert. denied* 303 Md. 295, 493 A.2d 349 (1985), we noted that "unilateral pronouncements by an employer may create legally enforceable expectations on the part of its employees." Our holding, however, expressed at 392, was that "provisions in such policy statements that limit the employer's discretion to terminate an indefinite employment or that set forth a required procedure for termination of such employment may, *if properly expressed and communicated to the employee,* become contractual undertakings by the employer that are enforceable by the employee." (Emphasis added.) We see nothing in the letter or memorandum from Dr. Bellavance properly expressing any commitment to a 12–month term; nor, as is clear from Mr. Fineran's testimony, was the policy statement in the Board's Administrative Salary Plan ever communicated to Fineran prior to the submission of his resignation.

 Nor would the mere mention of a 12–month salary in Dr. Bellavance's 1984 letter or his 1985 salary memorandum suffice to create a 12–month term. As made clear in *McCullough Iron Co. v. Carpenter*, 67 Md. 554, 557, 11 A. 176 (1887), and confirmed in *Gill v. Computer Equip. Corp.*, 266 Md. 170, 179, 292 A.2d 54 (1972), "[i]t is also well settled that a hiring at so much a week, month or year, no time being specified, does not, of itself, make more than an indefinite hiring."

On the record before us, then, the evidence compels the conclusion as a matter of law that Mr. Fineran not only did not have a written contract providing for a fixed term of employment but never thought that he had such a contract. From that, it becomes clear that the court erred in denying the motion as to Count I.

### *Interference With Contract (Count XIII)*

 Count XIII, as noted, charges Dr. Bellavance with willfully inducing the other defendants to breach Mr. Fineran's employment contract. Having concluded that there was no such employment contract, we hold as well that the court erred in denying the motion as to Count XIII.

### *Other Claims*

Mr. Fineran's other claims, as embodied in the remaining 11 counts, are based on the predicate averments that his letter of resignation was coerced or fraudulently induced and that he was therefore constructively, and wrongfully, discharged. All of the arguments made by the parties go to the wrongfulness of the discharge—whether it was in retaliation for the exercise of First Amendment rights, whether it was in contravention of Education article, § 14–110, whether it breached other, more amorphous, rights found in the Fourteenth Amendment and the Md. Declaration of Rights. But none of that is relevant unless there was a discharge—actual or constructive—in the first instance.

Mr. Fineran has claimed that Dr. Bellavance asserted the right and the intention, on his own, to terminate Fineran's

employment unless Fineran resigned, and that his action in this regard was without proper justification and in response to comments Fineran made, and had a right to make, to a newspaper reporter. Because the case reaches us in the context of a motion for summary judgment, we accept the factual component of those assertions as being true.

The uncontradicted evidence shows, however, that, in response to Mr. Fineran's claim, made through counsel, that Dr. Bellavance had misrepresented his authority, that the letter of resignation was submitted under duress and was invalid, and that Dr. Bellavance had trampled upon this spectrum of rights, the college and the Board, through its counsel, offered Fineran the opportunity to withdraw the resignation. The Assistant Attorney General agreed that Dr. Bellavance "does not have the power to actually terminate Mr. Fineran or to accept his resignation," that "[b]oth of those actions must be taken by the Board of Trustees." The letter concluded, in this regard:

"Mr. Fineran does have the ability to withdraw the resignation prior to that Board meeting. *See Lemlich v. Board of Trustees of Harford Community College,* 282 Md. 495 [385 A.2d 1185] (1978). Of course, if Mr. Fineran should withdraw his resignation, President Bellavance will request the Board to approve Mr. Fineran's termination. Mr. Fineran would then lose the benefit of being paid through December 31 and his record at the College would reflect the termination. As has always been the case, it is Mr. Fineran's choice as to whether he will resign or be terminated."

Counsel responded to that letter. In his response, he acknowledged a telephone call from Mr. Lester, the Assistant Attorney General, adding that "Mr. Fineran could submit a letter outlining his position for the Board's consideration at its meeting on November 21, 1985 in connection with any recommendation of dismissal by Dr. Bellavance" but that such a submission "would not amount to a 'hearing.'" Counsel informed Mr. Lester that, in order to preserve his compensation through December 31, "Mr. Fineran has con-

cluded not to withdraw his alleged resignation." He added that the resignation would be withdrawn only if the Board agreed to "apply the requirements for dismissal set forth in Section 14–110(a)(1)."

In light of that response, what came before the Board on November 21 was not a recommendation for termination but a letter of resignation that, on its face, seemed perfectly valid. The uncontradicted evidence, presented in the form of affidavits filed by each of the Board members other than Mr. Archibald, showed that:

"Among the matters considered at that session were appointments and separations of college personnel, including the separation of James V. Fineran, Director of Public Relations, Salisbury State College. Approval of personnel appointments and separations is a routine agenda approved along with all other appointments and separations in the ordinary course of the Board's official business.

I have no knowledge that Mr. Fineran requested a hearing before the Board to contest his separation nor do I have knowledge of any such request being presented or disclosed to the Board for consideration at any time. Finally, I have no personal knowledge of the facts and circumstances leading to Mr. Fineran's separation nor were the facts and circumstances of his separation made known to me prior to the Board's unanimous approval of Mr. Fineran's separation on November 21, 1986 [sic, 1985]."

Mr. Archibald asserted in his affidavit that counsel's initial letter had been referred to the Board's attorney and that "[t]he letter and the contents of it were, to the best of my present recollection, not discussed by the Board of Trustees prior to its approval of Mr. Fineran's separation on November 21, 1985."

■ Several conclusions necessarily flow from this undisputed evidence. The most obvious one is that there is no basis whatever for any liability on the part of the individual

Board members who were unaware of counsel's letter or the claims made in it. The clear and uncontradicted evidence shows that they acted in good faith on what was, to all intents and purposes, a letter of resignation. Summary judgment was unquestionably mandated in their favor for that reason alone, whether on the ground of immunity under Md.Code Ann.State Gov't art., § 12–105(a) and the principles laid down in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), or simply because no cause of action against them was stated.

 Even as to Mr. Archibald, Dr. Bellavance, the college, and the Board as an entity the same result would flow, albeit for a different reason.

Despite Mr. Lester's implicit prediction that, if the resignation were withdrawn, the Board would terminate Fineran's employment, that was certainly not a foregone conclusion. By November 8—the date of counsel's response to Mr. Lester—it was clear to everyone that only the Board could effect an involuntary termination of Fineran's employment and that Dr. Bellavance had only the authority to recommend such termination. The statute made that clear and the case cited by Mr. Lester, *Lemlich v. Board of Trustees, supra,* 282 Md. 495, 385 A.2d 1185, made it clear.

There is nothing in this record to suggest that, had Mr. Fineran withdrawn his resignation and availed himself of the opportunity to present his position to the Board, even in the form of a letter, the Board would have routinely rubber-stamped Dr. Bellavance's recommendation. The record does not reveal any pattern or history of such conduct by the Board; indeed, it does not show even a single instance of it. Nor, in making his prediction, did Mr. Lester appear to be speaking for the Board; it is evident from the affidavits that he had not discussed the matter with any of the Board members other, perhaps, than Mr. Archibald.

Quite apart from anything that occurred in September, the situation as of November 8 was simply this. In lieu of proceeding with a recommended termination which, if ap-

proved, would likely take effect November 21, Fineran was offered the opportunity to resign and receive, among the other benefits of a resignation as opposed to a termination, an additional 40 days of compensation. He obviously weighed his options, with the advice of counsel, and elected not to withdraw the resignation. That is not, in our view, a constructive discharge forced upon Fineran by Dr. Bellavance, Mr. Archibald, the college, or the Board. Compare *Cumb. & Penn. R.R. Co. v. Slack*, 45 Md. 161 (1876).

Had Mr. Fineran withdrawn his resignation and contested the recommended termination and had the Board then approved the termination, he would have been in a position to argue a violation of § 14–110 and perhaps some or all of the greater Constitutional rights he now asserts. By maintaining the resignation and electing to make no protest whatever to the Board, however, he effectively gave the Board no option.

It is for this reason that we find no cause of action stated against these remaining defendants, and we could thus end our Opinion at this point. Because the question of whether Mr. Fineran was entitled to the protection of § 14–110 is so central to his complaint, however, we shall address that issue. Our conclusion will be of no help to Mr. Fineran.

 Section 14–110 has a long legislative history. Prior to 1916, the State Normal Schools—the forerunners of most of the current State Colleges and Universities under the Board's control—were governed by the State Board of Education. The law then authorized a "faculty" for those schools consisting of "the principal and of as many teachers as may be determined by [that Board], who shall be appointed by said board, and have such salaries and perform such duties as said board may direct." Nothing was said about tenure or removal and nothing was said about employees other than the "faculty." See 1898 Md.Laws, ch. 221; Md.Code Ann. (1904), art. 77, § 78.

In 1916, a separate Board, consisting of the members of the State Board of Education and the State Superintendent

of Schools, was created to govern these colleges. The Board was empowered to authorize "all positions" and to fix the "salaries *and tenure* of all teachers, *and all assistants of whatever kind....*" (Emphasis added.) The Board could

> "dismiss any teacher or *any assistant* for immorality, dishonesty, misconduct in office, incompetency, insubordination and wilful neglect of duty, but no teacher *or professional assistant* may be dismissed without being given a copy of the charges against him and an opportunity of being heard, in person or by counsel, in his own defense, upon not less than ten days' notice."

(Emphasis added.) 1916 Md.Laws, ch. 506, § 83. Though recodified a number of times, those provisions remained in the law, more or less intact, until the enactment of the Education article in 1978. Most recently before then they appeared in Md.Code Ann. (1975 Repl. Vol. and 1977 Supp.), art. 77A, § 12(d). Since 1963, when governance of the State Colleges was removed from the State Board of Education and the State Superintendent of Schools, those powers were exercised by the Board of Trustees of the State Colleges, later renamed to the Board of Trustees of the State Colleges and Universities.

On at least three occasions during the 1960's the Attorney General construed these provisions as *not* providing any kind of automatic tenure, even to teachers, but rather as merely authorizing the governing Board to fix and provide such tenure, either by regulation or by contract. The earliest exposition of this view was in 46 Op.Att'y Gen. 74 (1961). At 75, the Attorney General stated:

> "The initial inquiry, therefore, is whether or not the above quoted provisions of the statute in themselves create tenure for teachers, in the sense in which that term is universally recognized under laws relating to the employment of teachers in public institutions, whereby no teacher having attained such status may be dismissed or terminated without good cause and an opportunity to be heard. Ordinarily those sections would not have that

effect since tenure is strictly a creature of statute and the right thereto exists only in accordance with and subject to the precise conditions laid down in a statute creating it. *Nothing in Section 165* [2] *purports to create tenure or to set forth any conditions for the attainment thereof."* (Emphasis added.)

The Attorney General continued, however, that § 165 did authorize the Board of Trustees to "fix the tenure of all teachers," which he found it had done through a by-law mandating a uniform contract for teachers in the State Colleges. That contract, he said, is what established the conditions of tenure. Construed in light of *Board of Education v. Cearfoss,* 165 Md. 178, 166 A. 732 (1933), the contract made clear that (1) it could be terminated, upon notice, at the end of the first or second year, and (2) tenure did not commence until the end of the second year. On that basis, the Attorney General concluded, at 78,

"The provisions of the statute as to the grounds for suspension or dismissal and as to notice and opportunity to be heard must, therefore, apply only after such tenure has begun, or when such suspension or dismissal occurs during the term of the first or second year contract. Those provisions have no application to the termination of the contract at the end of the first or the second year which must be considered a probationary period."

The underlying conclusion reached in that Opinion—that the statute did not directly confer tenure on anyone but merely authorized the Board to confer and set the conditions of tenure—was confirmed by the Attorney General in subsequent Opinions reported at 48 Op.Att'y Gen. 122 (1963), and 54 Op.Atty' Gen. 128 (1969). See also *Parker v. Board of Education of Prince George's County,* 237 F.Supp. 222 (D.Md.), *aff'd* 348 F.2d 464 (4th Cir.1965), *cert. denied* 382 U.S. 1030, 86 S.Ct. 653, 15 L.Ed.2d 543 (1966),

---

**2.** At the time, these provisions were codified as Md.Code Ann. (1957), art. 77, § 165.

similarly construing an analogous statute affecting public elementary and secondary school teachers.

As we indicated, since the very inception of this broad authority to fix tenure in 1916, it has applied not only to teachers but also to "assistants" or "professional assistants." Those terms were never defined in the law, but, as the actual fixing of tenure was an administrative matter for the Board, the lack of definition never caused a problem. None of the successive governing boards chose to grant tenure, either by regulation or by contract, to administrative personnel not having some teaching-related responsibilities.

In enacting the Education article as part of the ongoing Code Revision process, the Legislature split these provisions, then codified as art. 77A, § 12(d), among several different sections. The general authority to appoint, fix tenure, and remove was placed in § 14–105(c) but with some change in language. Section 14–105(c) authorizes the Board, among other things, to "fix the salary and tenure of each *faculty member*" and to "dismiss any *faculty member* as provided in § 14–110 of this title." (Emphasis added.) The Revisor's Note to § 14–105(c) states that the subsection "presently appears as the first clause of the first sentence of Art. 77A, § 12(d)," that "[t]he term 'faculty member' is substituted for the present terms 'teacher' and 'assistant,'" and that "[a]s to the dismissal of faculty members, see § 14–110 of this title."

The origin of this substitution is traceable and significant. The bill was drafted by the Governor's Commission to Revise the Annotated Code of Maryland, the body then responsible for superintending the Code Revision effort. An early draft of the bill prepared by the Commission staff (Staff Draft No. 1) had retained the terms "teacher" and "assistant." In a letter of June 14, 1977, commenting on that draft, the Acting Executive Director of the Board stated that "[i]n higher education, the title 'teacher' is not commonly utilized, and the Board of Trustees does not know what is meant by 'assistant.' The proper terminology

is 'faculty member.'" She requested that the term "faculty member" be used throughout title 14, including §§ 14–105 and 14–110. The Commission accepted the recommendation and made the change in § 14–105(c)(2) and (4) and in § 14–106(b)(2). Through its "Report on Senate Bill 222 Education Article" delivered on December 9, 1977, the Commission informed the General Assembly that,

> "In § 14–105(c) *and throughout Title 14,* present references to 'teachers or professional assistants' are changed to 'faculty members'. The Board of Trustees informed the Commission that it does not use the classification 'professional assistant' and it prefers the term 'faculty member' when referring to instructors or professors at the college level...."

(Emphasis added.)

Unfortunately, the Commission (and ultimately the Legislature) did not make the substitution complete in § 14–110 but retained the apparently meaningless reference to "professional assistant" in that section. The Revisor's Note to § 14–110 states that the section "is new language derived *without substantive change* from the last half of the first sentence and the entire second sentence of Art. 77A, § 12(d)." (Emphasis added.)

We are, of course, mindful of the general rule of statutory construction that "no word, clause, sentence or phrase should be rendered surplusage, superfluous, meaningless, or nugatory." *Md. Port Adm. v. Brawner Contracting Co.,* 303 Md. 44, 60, 492 A.2d 281 (1985). We are also aware of the construction given to the analogous term "professional employee," as used in the Teachers' Retirement System Law (Md.Code Ann. art. 73B, § 110), in *Mauzy v. Hornbeck,* 285 Md. 84, 400 A.2d 1091 (1979). As the Court observed in *Kaczorowski v. City of Baltimore,* 309 Md. 505, 514–15, 525 A.2d 628 (1987), however:

> "When we pursue the context of statutory language, we are not limited to the words of the statute as they are printed in the Annotated Code. We may and often must consider other 'external manifestations' or 'persuasive

evidence,' including a bill's title and function paragraphs, amendments that occurred as it passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case."

From the Revisor's Notes [3] and from the Commission's Report, it is evident really beyond cavil that no substantive change in the law was intended by these sections. That is consistent, of course, with the principle normally applied with respect to code revision measures that such statutes are

"presumed to be for the purpose of clarity rather than change of meaning and, thus, even a change in the phraseology of a statute by a codification will not ordinarily modify the law unless the change is so radical and material that the intention of the Legislature to modify the law appears unmistakably from the language of the Code."

*Hoffman v. Key Fed. Sav. & Loan,* 286 Md. 28, 37, 416 A.2d 1265 (1979); *Welsh v. Kuntz,* 196 Md. 86, 75 A.2d 343 (1950); *Rohrbaugh v. Estate of Stern,* 305 Md. 443, 449, 505 A.2d 113 (1986); *Consumer Protection v. Consumer Pub.,* 304 Md. 731, 768, 501 A.2d 48 (1985). From all of this, it would be inappropriate to infer that, by splitting the former section into new sections 14–105 and 14–110 and retaining the term "professional assistant" in § 14–110, the Legislature intended to confer, directly, a tenure status on a group of non-faculty employees who did not previously enjoy that status. That would indeed be a radical and material change in the law, for which there is no document-

---

**3.** See *Dean v. Pinder,* 312 Md. 154, 538 A.2d 1184, (1988), at 163, 538 A.2d 1184: "It is a well-settled practice of this Court to refer to the Revisor's Notes when searching for legislative intent of an enactment."

ed evidence of intent either in the record or in the legislative history of the statute.

We therefore conclude that § 14–110 does not directly confer tenure on professional assistants, or on anyone else; nor are its protections applicable to any larger group of employees than were the protections of the antecedent statute, art. 77A, § 12(d).

That leaves the matter essentially in the hands of the Board. It certainly had the authority under former § 12(d), as construed by the Attorney General, to extend tenure, and to bring within the protective ambit of the statute one or more classes of professional employees who were not teachers, and, to the extent that "faculty member" was intended to be synonymous with "teacher or professional assistant," it still has that authority. Given the legislative history recounted above, it seems clear that "faculty members" may include persons other than teachers. That term is no more defined than were the earlier terms, which obviously leaves some discretion in the Board. We therefore look to see what the Board has done.

We find what it has done to be somewhat ambiguous. In this case, it has taken the position that

> "the Director of Public Relations is an unclassified administrative staff position. Administrators have no contract with the Board and are appointed for an indefinite term; accordingly, they do not have tenure and may be relieved of administrative responsibilities at any time.

> . . . . .

> There are no Board rules, regulations, policies or procedures requiring that administrators be provided a hearing prior to dismissal by the Board. According to longstanding Board practice, administrators serve solely at the pleasure of the Board and may be dismissed by the Board, without a hearing, usually upon recommendation of the College President."

Affidavit of Nelson P. Guild, Interim Executive Director of the Board.

Consistent with that position, certain high-level administrative personnel, including the Director of Public Relations, are specifically excluded from the grievance procedures adopted by the Board for administrative personnel, and there seems to be no alternative grievance procedure provided for them. As we indicated earlier, and unlike the case with teachers, no specific written contract, embodying terms of employment, is offered to these managerial employees.

On the other hand, the Administrative Salary Plan adopted by the Board provides, in relevant part, that:

"5. All administrative positions are twelve month appointments unless otherwise indicated.

6. Administrative personnel are not granted tenure as administrators. (An administrator serves at the pleasure of the President and may be relieved of administrative responsibilities at any time.) Administrative personnel may, however, hold faculty rank concurrent with their administrative appointments. In such cases, faculty rank, promotion, and tenure are granted in accordance with policies governing the teaching faculty."

These provisions are at best ambiguous; if ¶ 5 means what Mr. Fineran claims, it may well be inconsistent with ¶ 6. Were they intended, as the Board now insists, merely to provide for the payment of salaries on a 12–month basis, or were they meant rather to create a 12–month tenure? In the context of § 14–110, as we construe it, that would have been a matter for the Board to determine initially; it is the body charged with fixing tenure. Had Mr. Fineran pursued the argument he makes to us before the Board, he may have received a favorable, or at least a definitive, response. For us to conclude from this record, however, that their effect was to bring Mr. Fineran within the ambit of § 14–110, or, as he alternatively asserts, to give him some indefinite lifetime tenure would be tantamount to our exercising a prerogative committed to the Board.

**314**

ORDER REVERSED; CASE REMANDED TO CIRCUIT
COURT FOR ANNE ARUNDEL COUNTY WITH IN-
STRUCTIONS TO ENTER JUDGMENT FOR APPEL-
LANTS; APPELLEE TO PAY THE COSTS.