560 A.2d 599
**Clifford E. MEREDITH, et al.**
v.
**TALBOT COUNTY, Maryland, et al.**
**No. 1115 Sept. Term, 1988.**
Court of Special Appeals of Maryland.
July 7, 1989.

George J. Goldsborough, Jr. (Goldsborough & Tolley, on the brief), Easton, for appellants.

Andrew H. Baida, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Pamela D. Andersen and Lee R. Epstein, Asst. Attys. Gen., Annapolis, on the brief), for appellees, DNR and State of Md.

Roger D. Redden (Kurt J. Fischer, Piper & Marbury, Baltimore, James M. Slay, Jr. and Henry & Price of Easton, on the brief), for appellees, Talbot County, and Daniel R. Cowee.

Argued before GILBERT, C.J., and GARRITY and POLLITT, JJ.

GARRITY, Judge.

Under the facts specific to this case, we shall determine whether an agreement between a real estate development partnership and a local government entity is binding upon the partnership.

## FACTS

The undisputed facts are substantially as follows:

On September 16, 1985, Clifford E. Meredith, an experienced developer of real estate in Talbot County and other Maryland Eastern Shore Counties, was contacted by John Easton, a Talbot County realtor, about purchasing "Ashby," a 200.67 acre waterfront estate on the upper Miles River in Talbot County. Later that same day, Easton and Meredith drove to Ashby where Meredith walked the property and discussed with the realtor its development potential.

After analyzing the soil maps and the zoning regulations to ascertain the subdivision potential of the property, Meredith signed a contract to purchase Ashby for $1,522,034.00. The contract contained no contingencies of any kind, including any relating to the buyer's development or subdivision rights.

After signing the contract, Meredith contacted various business associates and began the process of forming a general partnership for the acquisition and development of

Ashby. As a result, on September 21, 1985, an agreement was signed creating the "Ashby Partnership." Meredith was named managing partner in the agreement and was charged with, among other things, the responsibility of representing the Partnership in its efforts to comply with Talbot County regulatory requirements, including subdivision approval.

The Partnership immediately began the task of obtaining subdivision approval for the property. In that regard, on October 8, 1985, representatives of the Partnership met with the Talbot County Planning and Zoning Commission and the Talbot County Planning Officer for a sketch plan review. Two proposals for the subdivision of Ashby, each containing 28 lots, were presented to the Planning Commission. Although neither proposal "appealed" to the Planning Commission, it indicated that one of the proposals was preferable and requested that the Partnership submit an environmental assessment prior to final approval of the subdivision application.

As Ashby bordered a tidal tributary of the Chesapeake Bay, the Partnership's subdivision application was subject to the requirements imposed by the State's Chesapeake Bay Critical Area Protection Program, Md.Nat.Res.Code Ann. §§ 8–1801–1816 (1988 Cum.Supp.) (hereinafter cited as the Critical Area Law). That legislation, effective June 1, 1984, generally seeks to effectuate the public policy of protecting the natural resources and habitat of the Chesapeake Bay by controlling the intensity of human activities within the Bay's watershed. Nat.Res.Code, § 8–1801. The General Assembly has defined the area in which sensitive development activity is to be fostered—the "Chesapeake Bay Critical Area"—as generally consisting of all waters of and lands under the Chesapeake Bay and its tributaries, including wetlands and all land and water areas within one thousand feet beyond the landward boundaries of wetlands and the heads of tides. Nat.Res.Code, § 8–1807. Furthermore, and reflective of the sense of urgency which moved the Legislature to enact the Critical Area Law, the law

requires that from June 1, 1984 until an approved critical area program becomes effective in a local jurisdiction (i.e., each county subject to the law), the jurisdiction shall make the following specific findings with respect to any subdivision plat approval or zoning amendment, variance, special exception, conditional use permit or use of a floating zone affecting any land or water area located in the critical area:

(1) The proposed development will minimize adverse impacts on water quality that result from pollutants that are discharged from structures or conveyances or that have run off from surrounding lands; and

(2) The applicant has identified fish, wildlife, and plant habitat which may be adversely affected by the proposed development and has designed the development so as to protect those identified habitats whose loss would substantially diminish the continued ability of populations of affected species to sustain themselves.

Nat.Res.Code, § 8–1813 (hereafter cited as the Interim Findings Requirements). As Talbot County, during the pendency of the Partnership's subdivision application, had not adopted an approved critical area program, the Interim Findings Requirements of § 8–1813 were applicable in that jurisdiction.

On November 19, 1985, while the Partnership's subdivision application was still pending, the Talbot County Council enacted a moratorium on subdivision approvals in the County's critical area. The moratorium was to be effective from December 1, 1985 until July 1, 1986, or until Talbot County completed its critical area planning process.[1] Also during the pendency of the application, the Planning Commission and the Planning Officer were notified that a portion of Ashby was inhabited by the following two endangered species: a pair of bald eagles nesting near the dividing line

---

1. Notwithstanding the moratorium's planned termination date, oral argument made clear that it is still in effect.

between the Partnership's proposed lots 11 and 12 and the Delmarva Fox squirrel.[2]

On November 26, 1985, the Planning Commission, after considering recommendations from the State Department of Natural Resources and the Department of State Planning regarding the protection of the endangered species' habitat, recommended to the Planning Officer that, in order to comply with the Interim Findings Requirements of the Critical Area Law and, thus, to obtain subdivision approval, the Partnership would have to subdivide Ashby subject to, among other things, the following conditions:

> Lots 10, 11, 12, 13 and 14 are to be reserved until four years after there are no eagles using the subdivision property. This must be confirmed by the State of Maryland Department of Natural Resources. Subdivision of lots 10, 11, 12, 13 and 14 is not approved. If subdivision is desired after the four year time limit, it may be applied for under the then current subdivision regulations.

Before the Planning Officer made a final decision on the Partnership's unrestricted subdivision plat, however, Meredith, in his capacity as managing partner of the Partnership, contacted the Planning Officer and made a compromise proposal for the development of Ashby. Under the terms of the proposal the Planning Officer would promptly approve the subdivision plat in its original form—including subdivision of lots 10 through 14—generally subject to the conditions that the Partnership would neither offer lots 10 through 14 for sale to any party other than a conservation organization nor develop the area in contravention of the Planning Commission's recommendations.

---

**2.** The bald eagle is protected by federal law. *See* Bald Eagle Protection Act, 16 U.S.C. §§ 668–668d, Migratory Bird Treaty Act, 16 U.S.C. §§ 703–708, 709a–711, and Endangered Species Act, 16 U.S.C. §§ 1531–1543. *See also Andrus v. Allard,* 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979). It is also protected under the laws of this State. *See* Nongame and Endangered Species Conservation Act, Md.Nat.Res. Code Ann. §§ 10–2A–01 to –09, and Md.Regs.Code tit. 8, § 03.08 (1988). The Delmarva Fox squirrel is also protected under the federal and state endangered species acts.

The Planning Officer agreed to the terms of Meredith's proposal but required that he put it in writing before she would approve the subdivision plat. Thus, on November 27, 1985, Meredith set forth the proposal in a letter to the Planning Officer as follows:

The Planning Commission has recommended that the subdivision plat receive final approval, provided it is modified to delete lots 10, 11, 12, 13, and 14 as buildable lots. The Planning Commission has further recommended that those lots be reflected as a "reserved area," with all development prohibited until four years after the existing pair of bald eagles has ceased to use the nest site located on the subject property. As Talbot County Planning Officer, you have indicated that you will adhere to the Planning Commission's recommendation, and will not approve the subdivision plat.

I indicated to you that in light of the conditions imposed by your office, the investors whom I represent may wish to donate the lots in question to the Nature Conservancy or some other bona fide conservation organization, and that the tax aspects of such a donation may be adversely affected if we cannot make the donation on a per lot basis. You indicated that you would approve the plat in its present form, provided I would guarantee to you that those lots will not be offered for sale to the public, or to any person or entity other than a bona fide conservation organization, and that there will be no development of those lots except in accordance with the Planning Commission recommendations. In the event that the donation is not accomplished within one year from the date of your approval, you will require that the subdivision plat be modified to delete the lot lines so as to show the area in question as one parcel, identified as "reserved area." It is my understanding that this issue must be resolved today, and that after today, I will not be able to secure your approval of the subdivision plat. Please let me know if the foregoing is incorrect in any respect.

Based upon the understandings set forth above, I hereby agree to the conditions set forth in the above paragraph, and request that you approve the subdivision plat subject to this letter.

Subsequently, on the same day, the Planning Officer gave final approval to the Partnership's subdivision plat and signed it subject to the statement that "lots 10–14 are approved in accordance with agreement dated 11/27/85." Thereafter, and prior to December 1, 1985, the Partnership recorded the subdivision plat among the land records of Talbot County.[3]

The Partnership began marketing the property as soon as it had obtained subdivision approval. The record indicates that the Partnership has sold, or is offering for sale, approximately 160 acres of the property for upwards of two million dollars.

Several months after the subdivision plat was recorded, the Partnership requested approval for a building permit for the construction of one or two houses on the restricted portion of Ashby. That request was denied. The Partnership later sought a waiver of the restrictions imposed upon the property. That request was also denied. No appeal was taken from the denial of either of these requests.

Thereafter, the Partnership [4] filed this action in the Circuit Court for Talbot County against Talbot County; the Talbot County Planning Officer; the State of Maryland, Department of State Planning and Department of Natural Resources; and the Attorney General for the State of Maryland. The two principal claims for relief were (1) that

---

3. On December 11, 1985, the Talbot County Assistant Planning Director issued to the Partnership a memorandum formally notifying it that "the Talbot County Planning and Zoning Commission and the Talbot County Planning Director have approved your subdivision" subject to the conditions Meredith previously agreed to in the November 27, 1985 letter.

4. Meredith and Ashby Partnership were plaintiffs below and are appellants in the present case.

the refusal to approve the unrestricted subdivision of lots 10 through 14 constituted a "taking" of those lots without just compensation in violation of the Fifth (and Fourteenth) Amendments to the United States Constitution; 42 U.S.C. § 1983; Article III, Section 40, of the Constitution of Maryland; and Title 12 of the Maryland Real Property Code and (2) that the violations of State and local law deprived the Partnership of due process rights guaranteed by the Fourteenth Amendment to the United States Constitution; Article 24 of the Maryland Declaration of Rights; and 42 U.S.C. § 1983.

The defendants below moved for summary judgment pursuant to Md. Rule 2–501. The circuit court (Smith, J.) granted the motions on the following ground:

I think, and hold, that plaintiffs' action here is barred by Meredith's voluntary agreement on behalf of the Partnership. I realize full well that plaintiffs claim that he was acting here under duress. I think the defendants are correct when they say that the actions of Meredith here were not under such duress as would bar the agreement and they cite *Board of Trustees v. Fineran*, 75 Md.App. 289, 541 A.2d 170 (1988), which seems to me to be in point.

## DISCUSSION

### I. Standard of Review

As this matter reaches us from a grant of summary judgment, we shall briefly discuss our role in reviewing the trial court's decision.

According to Md.Rule 2–501(e), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." In determining whether any factual dispute exists, the trial court must resolve all inferences against the moving party. *Merchants Mortgage Co. v.*

*Lubow,* 275 Md. 208, 217, 339 A.2d 664 (1975); *DeGroft v. Lancaster Silo Co.,* 72 Md.App. 154, 160, 527 A.2d 1316 (1987) and cases there cited.

In reviewing a grant of summary judgment, we must also decide whether there is a genuine dispute as to any material fact, with inferences drawn in favor of the non-moving party, and whether the moving party is entitled to judgment as a matter of law. *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 621–22, 495 A.2d 838 (1985); *Washington Homes v. Interstate Land Dev. Co.,* 281 Md. 712, 717–18, 382 A.2d 555 (1978) and cases there cited.

II. Propriety of Grant of Summary Judgment

The appellants contend, *inter alia,* that the trial court erred in granting summary judgment against them on the basis of a voluntary agreement between Meredith and the Planning Officer. The appellant's principal argument in this regard is that genuine and material factual issues exist as to whether the agreement was made under "duress."

 Duress is essentially composed of the following two elements:

(1) A wrongful act or threat by the opposite party to the transaction or by a third party of which the opposite party is aware and takes advantage, and (2) a state of mind in which the complaining party was overwhelmed by fear and precluded from using free will or judgment.

*Food Fair Stores, Inc. v. Joy,* 283 Md. 205, 217, 389 A.2d 874 (1978) (quoting *Plechner v. Widener College, Inc.,* 418 F.Supp. 1282, 1294 (E.D.Pa.1976)). With respect to the first element, it is clear "the acts or threats must be wrongful." 283 Md. at 217, 389 A.2d 874 (citing Restatement of Contracts § 492, Comment g). Furthermore, it is well settled that an act, whether it be performed or threatened, may be wrongful even though not unlawful. 283 Md. at 217, 389 A.2d 874; *Eckstein v. Eckstein,* 38 Md.App. 506, 515, 379 A.2d 757 (1978); *Bell v. Bell,* 38 Md.App. 10, 17, 379 A.2d 419 (1977). To be wrongful, however, acts which are in themselves lawful must be so oppressively used as to con-

stitute an abuse of legal remedies. 283 Md. at 217, 389 A.2d 874 (citing *McBride v. Atlantic City*, 146 N.J.Super. 498, 370 A.2d 69 (1974), *aff'd per curiam*, 146 N.J.Super. 406, 370 A.2d 20 (1975), *aff'd*, 72 N.J. 201, 370 A.2d 1 (1976)).

We implicitly applied the foregoing principles in a summary judgment context in our recent decision in *Board of Trustees v. Fineran*, 75 Md.App. 289, 541 A.2d 170 (1988).

In that case, Thomas Fineran, the Director of Public Relations for Salisbury State College, was rebuked by the president of the college, Thomas E. Bellavance, for certain statements Fineran had made to a newspaper reporter. Allegedly for that reason, Bellavance told Fineran that he intended to terminate Fineran's employment but offered Fineran the opportunity to resign. Bellavance indicated that if Fineran chose to resign he would receive an additional 40 days of compensation and his employment record would not indicate that he was terminated. Believing that the president had authority to fire him, Fineran submitted his resignation. Thereafter, Fineran consulted with counsel who wrote a letter to Bellavance, asserting, among other things, that the resignation was submitted under duress and that the Board of Trustees of the State Universities and Colleges, not the college president, had the authority to accept the resignation. The college, through its attorney, responded that it agreed that dismissal authority lay with the Board of Trustees and stated that Fineran's resignation would be submitted at a subsequent meeting of the Board. The college's attorney also stated that Fineran could withdraw his resignation prior to the Board meeting, but that if he did so Bellavance would recommend his termination to the Board, and that if the Board approved the termination Fineran would not receive the additional 40 days of compensation and his employment record would indicate that he was terminated. In the face of this, Fineran chose not to withdraw his resignation, which the Board accepted at its next meeting.

Fineran subsequently brought suit against the college, the college president, the Board of Trustees, and the chairman of the Board, alleging violations of his right of free speech under the First Amendment to the United States Constitution and that his "resignation" was the product of duress and misrepresentation and amounted in fact to a constructive discharge. The lower court denied a motion for summary judgment filed by the defendants in the case as to all of Fineran's claims. On appeal, we reversed, ruling that, because the Board's action in accepting Fineran's resignation was taken pursuant to an agreement between Fineran and the college which bestowed benefits on both sides, Fineran could not pursue his claims:

> Quite apart from anything that occurred in September, the situation as of November 8 was simply this. In lieu of proceeding with a recommended termination which, if approved, would likely take effect November 21, Fineran was offered the opportunity to resign and receive, among the other benefits of a resignation as opposed to a termination, an additional 40 days of compensation. He obviously weighed his options with the advice of counsel, and elected not to withdraw the resignation.
>
> . . . . .
>
> Had Mr. Fineran withdrawn his resignation and contested the recommended termination and had the Board then approved the termination, he would have been in a position to argue a violation of ... the greater Constitutional rights he now asserts.

75 Md.App. at 305–06, 541 A.2d 170.

In the present case, the uncontroverted evidence shows that Meredith made the compromise proposal in the face of the Planning Commission's recommendation that development of lots 10 through 14 be prohibited and the Planning Officer's indicated intent to abide by those recommenda-

tions.[5] Similar to the situation in *Fineran,* however, the proposal, if accepted, would bestow significant benefits upon all parties. For the appellants, those benefits included the immediate prerogative to subdivide and sell 160 acres of Ashby instead of suspending development pending appeal of the likely denial of their unrestricted subdivision plat, approval of the subdivision plat before the moratorium became effective, and subdivision of the restricted lots (10 through 14) so as to provide the appellants with an opportunity to maximize any tax advantage available from transferring those lots to a conservation organization. For Talbot County, those benefits included the satisfactory resolution of a problematic subdivision application. Before extending the proposal, the appellants, like the administrator in *Fineran,* undoubtedly weighed the available options with the advice of counsel. It is clear to us that the appellants simply made a reasonable and informed business decision to reap the indubitable benefits of immediate subdivision approval by agreeing to restrict the use of a portion of the property.[6] The fact that the decision was made in the face of likely adverse governmental action is of no consequence.

For those reasons, viewing the record in a light most favorable to the appellants, we conclude that there is no genuine dispute of material fact as to the existence of

---

5. The appellants also urge us to reverse the lower court because the proposal was made *after* the Planning Officer's "determination" to reject the unrestricted subdivision plat and only to "minimize damages." This argument is without merit. There is no genuine dispute that, although the Planning Officer indicated an intention to abide by the Planning Commission's recommendations prior to Meredith extending the compromise proposal, the only recorded, and thus final, decision made by the Planning Officer on the appellants' application was her signing of the subdivision plat pursuant to the November 27, 1985 agreement.

6. The appellants suggest that they, in fact, did not agree to the restrictions imposed upon lots 10 through 14. The simple answer to this argument is that, as the appellants' failed to raise the contention below, it is not properly before us. Md.Rule 8–131. Nonetheless, we would venture that the appellants' averment is devoid of evidentiary support.

duress in the case *sub judice.* We hold, therefore, that the trial court was correct in granting summary judgment against the appellants on the basis of a voluntary agreement between Meredith and the Planning Officer.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.